

DA 08-0311

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 127

JERRY NARUM,

        Petitioner and Appellee,

  v.

LIBERTY NORTHWEST INSURANCE CORP.,

        Respondent/Insurer and Appellant.

APPEAL FROM:    Montana Workers' Compensation Court, WCC No. 2007-1987
                Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Larry W. Jones, Law Offices of Larry W. Jones, Missoula, Montana

        For Appellee:

                Patrick R. Sheehy, Halverson, Sheehy & Plath, Billings, Montana

                        Submitted on Briefs:  March 4, 2009

                                  Decided:  April 14, 2009

Filed:

                  _____
                                 Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Liberty Northwest Insurance Corporation (Liberty) appeals from a decision of the Workers' Compensation Court (WCC) holding that Liberty is liable to claimant Jerry Narum (Narum) for medical and hospital benefits related to the treatment of his left hip, and granting him an award of attorney fees and costs as well as a statutory penalty of 20% pursuant to § 39-71-2907, MCA. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Narum worked in the beer and wine business for 37 years. For the last 17 years of his employment, he drove a small semi-truck delivering beer. Narum's job duties including heavy lifting and loading. On March 6, 2003, Narum was stepping out of his truck when he either slipped or missed the last step and fell to the pavement, landing on his left side. Narum experienced slight pain at the time but ignored it and continued to work. Several weeks later, when the pain had not subsided, he filed a workers' compensation claim, claiming injury to his left hip. Narum filed a report of the occupational injury on April 4, 2003, in which he described the circumstances of the injury.

¶3 Prior to this accident, Narum had never received any treatment for either hip. The first time he experienced pain in his hip was subsequent to the fall. Liberty accepted liability for the claim and paid benefits through December 3, 2003. After he filed his claim, Narum sought medical treatment with Rebecca Rinehart (Rinehart), a physician's assistant. Rinehart referred Narum to Dr. Michael C. Willis (Dr. Willis), an orthopedic surgeon who specializes in sports medicine.

2

¶4 Dr. Willis first saw Narum on April 9, 2003. In his examination, Dr. Willis noted that Narum had been complaining of a progressive onset of pain in his left hip. Because Dr. Willis' examination occurred days after Rinehart's examination of Narum, Dr. Willis had not reviewed her notes and was not aware of the slip and fall injury when he examined Narum. X-rays taken of Narum's hip in conjunction with the examination indicated to Dr. Willis that Narum was suffering from a degenerative joint disease in his left hip. Dr. Willis recommended medical treatment for the pain. Dr. Willis also suggested Narum might be a candidate for hip replacement surgery at a later date, but did not favor surgery at that point because he was "very active" and the surgery would limit his activities. Narum had a follow-up visit with Dr. Willis approximately six weeks later. During that visit, Narum continued to complain about pain in his left hip.

¶5 Narum continued to work for his employer until June 2003, when the business was sold and he was not rehired by the new owner. Since that time, Narum has not worked and considers himself retired.

¶6 On July 18, 2003, Narum saw Dr. Scott K. Ross (Dr. Ross) for a medical consultation regarding his ongoing hip pain. Dr. Ross reviewed the records of Narum's visit with Rinehart and Dr. Willis, and conducted his own examination. Dr. Ross concluded that Narum's hip pain had improved approximately 20% since the accident, but that he continued to experience sharp pain in his left hip, which bothered him more when he was at rest. Narum reported that he was sometimes pain-free, but used pain medication on a daily basis. Dr. Ross noted that Narum had subjective complaints of pain and that the x-rays indicated significant degenerative osteoarthritis. Dr. Ross opined

3

that Narum was not at maximum medical improvement (MMI) at that time. Dr. Ross recommended physical therapy and continued use of pain medication to treat Narum's symptoms.

¶7 Dr. Ross re-evaluated Narum on September 9, 2003. Dr. Ross noted that Narum continued to experience pain when sitting, had developed a limp, and reported an almost constant pain in his left hip. Dr. Ross noted that while Narum's degenerative condition had been present for some time, Narum was asymptomatic before the March 2003 work injury, and had not yet recovered to his pre-injury status. Dr. Ross recommended a follow-up visit with Dr. Willis and a consideration of more aggressive therapy alternatives, including cortisteroid injections and possible hip replacement. Dr. Ross gave Narum an 8% whole person impairment rating. Narum continued to receive treatment for the pain resulting from his hip condition.

¶8 On October 17, 2003, Dr. Michael H. Schabacker (Dr. Schabacker) performed an independent medical examination (IME) on Narum. Dr. Schabacker's report summarizes Narum's medical records and his own recorded notes of Narum's examination, and contains responses to questions submitted by a representative of Liberty. Dr. Schabacker noted that Narum was asymptomatic prior to the March 2003 injury, but had continued to experience ongoing hip pain after the accident, which varied from no pain to moderate pain in relation to his activity level. Dr. Schabacker's impression was that Narum had persistent left hip pain following his fall at work which was exacerbated by his left hip degenerative condition. Dr. Schabacker opined that Narum's degenerative joint disease predated the work injury in March 2003, and that it was more probable than not that the

4

work injury led to left hip pain due to the preexisting problem. Dr. Schabacker concluded it was unlikely that Narum would have experienced a prolonged recovery from the industrial injury if he had not suffered the degenerative condition in the first place, and that the injury itself did not lead to the development of the degenerative condition. Dr. Schabacker also concluded that only 25% of Narum's condition was attributable to his work-related injury and that he should have received only a 2% impairment rating.

¶9 On November 18, 2003, Dr. Willis wrote a letter explaining his treatment and examinations of Narum. In the letter, Dr. Willis stated that his degenerative condition had been exacerbated by the work injury. Dr. Willis also stated that Narum's "injury has been disconnected from his Workers' Compensation Claim, as it was more than likely a pre-existing condition, exacerbated by work. Mr. Narum has significant hip pain, which has since the time of this injury, limited his ability to return to work, and he really feels that he is unable to return to the form of work which he was doing prior to this exacerbation." Dr. Willis further concluded in the letter that Narum's degenerative hip condition made it unlikely that he could return to the type of employment he engaged in at the time of the injury.

¶10 Liberty continued to pay Narum medical benefits until December 2003, when it informed him that it would no longer pay benefits because he had reached MMI and had been given an 8% impairment. Narum then obtained counsel in order to reach a settlement. Narum later testified that his primary concern was to ensure that his medical benefits remained open, since his medical examinations indicated that he would eventually need a hip replacement.

5

¶11    In early 2004, Narum's attorney began negotiating a settlement with Liberty.  On February 23, 2004, the terms of this settlement were memorialized in a letter.  The letter stated that the parties had agreed Liberty would pay Narum $25,000 in new money and would allow Narum to reserve his medical benefits.  The settlement was approved by the Department of Labor and Industry on March 11, 2004.  The terms of the agreement, drafted pursuant to the Department's standard Petition for Settlement form, stated in pertinent part as follows:

> The claimant and the insurer petition the Department of Labor & Industry for approval of this settlement allowing the claim to be fully and finally closed.  Further medical and hospital benefits are reserved by the claimant, excepting those conditions stated specifically in the Special Provisions below.[1]  The claimant understands that by entering into a settlement, both the insurer and the claimant agree to assume the risk that the condition of the claimant, as indicated by reasonable investigation to date, may be other than it appears or may change in the future.  Specifically, the parties acknowledge that the claimant may require a total hip replacement in the future . . . .

¶12    On May 11, 2004, Narum was seen again by Dr. Willis.  Dr. Willis noted that Narum had not been back to work as a driver and determined that Narum's symptoms of hip degeneration were exacerbated by his previous work position.  Dr. Willis concluded that Narum would not be able to return to his previous position as a driver.

¶13    For some time after the settlement, Liberty continued to pay Narum medical benefits related to his left hip.  On January 12, 2006, Liberty sent Dr. Willis a letter asking him two true/false questions about the causation of Narum's hip condition.  One of the questions asked whether "Mr. Narum's present condition is related to his preinjury

---

[1] These exceptions are not relevant to Liberty's appeal.

degenerative hip joint disease and not his work injury of 03-06-2003." Dr. Willis circled "true" after this statement. The second question asked whether "Mr. Narum's present condition is related to his ongoing physical activities and is not related to his work injury of 03-06-2003." Dr. Willis circled "false" after this question, and wrote "His condition is related to [degenerative joint disease] of his hip. His 'activities' are not causative." Based on Dr. Willis' response to the letter, Liberty refused to make further payments of medical benefits related to the treatment of his left hip.

¶14    In January 2007, Narum realized he was going to need hip replacement surgery. During this time, Narum was receiving cortisone shots for his hip pain, which Liberty refused to pay for. Narum later testified that Liberty did not inform him that it would no longer pay for the cortisone shots, but that he received word of Liberty's refusal to pay from his medical provider after Liberty had informed the provider that it would not pay for the shots. On September 7, 2007, Narum had hip replacement surgery which was performed by Dr. Willis. Liberty refused to pay for the surgery and related treatment based on Dr. Willis' responses to the January 2006 letter.

¶15    Narum subsequently filed a claim before the WCC, seeking medical and hospital benefits related to treatment for his left hip condition, an award of reasonable attorney fees and costs, and a statutory penalty of 20% based on Liberty's refusal to pay benefits. The WCC considered all of Narum's medical records, as well a deposition from Dr. Willis. In addition, Narum testified before the WCC and the court found him to be a credible witness. In a written order dated June 4, 2008, the WCC found that Liberty was

7

liable for medical and hospital benefits related to treatment of Narum's hip, and awarded Narum a 20% statutory penalty and reasonable attorney fees and costs.

¶16   In its factual findings, the WCC considered whether Dr. Willis' evaluations of Narum indicated that his work accident had caused his pain, or whether the pain and resulting hip surgery was attributable solely to his degenerative condition.   In his deposition, when asked if the March 2003 injury was "the cause or the aggravant" to Narum's degenerative joint disease which caused the hip pain, Dr. Willis responded as follows:  "If he had had continued pain related to that fall, then it would be my opinion that that injury exacerbated his pain.  He certainly had interims of very little, if no pain." The WCC noted that Dr. Ross' evaluations of Narum seemed to contrast with the opinions of Dr. Willis, as Dr. Ross had noted that Narum was in ongoing and continuous pain from the left hip, and had been asymptomatic prior to the March 2003 injury. Furthermore, Dr. Ross had specifically indicated that Narum should receive more aggressive therapy for his treatment, including injections and possible hip replacement. The WCC reconciled this dissonance in the evidence as follows:

> Dr. Ross' history contrasts noticeably with that of Dr. Willis'.  Dr. Willis was unaware  of Petitioner's industrial accident, and based his opinion that it did not exacerbate Petitioner's degenerative hip condition on his understanding that Petitioner experienced periods of little to no pain subsequent to the industrial accident.  Dr. Ross' history, however, reflects that Petitioner had ongoing and continuous pain which worsened over time and was relieved only through use of medication.
> Petitioner testified that since the day of his industrial accident, he has had constant pain, but it has waxed and waned depending on his activity level.  He also received several cortisone shots which almost completely alleviated his pain for three or four months after each shot. However, the shots eventually ceased working.  Petitioner described his hip pain as a "steady, slow-moving increase" from the day of the industrial

accident forward, and asserted that the pain has never entirely gone away since the accident. Petitioner may have experienced low-pain or pain-free periods subsequent to his industrial accident, but these periods were due to pain management of one type or another. I find that Dr. Wills misapprehended Petitioner's alleged "interims of very little, if no pain." I find that the evidence demonstrates Petitioner had ongoing pain from the time of his industrial accident.

¶17 Additionally, the WCC addressed Dr. Willis' responses in the January 2006 letter with regard to the causation of Narum's hip condition. In his deposition, Dr. Willis explained that he read the second question (see ¶ 13) to be an either/or proposition, seeking to ascertain whether Narum's condition was due to his work, or other activities. Dr. Willis explained that the degenerative condition itself was caused by neither, and thus responded "false" to the question, clarifying his response with an additional sentence.

¶18 In its conclusions of law, the WCC determined that the underlying causation of Narum's hip condition (i.e., whether it was related to the industrial accident or solely to the pre-existing degenerative condition) was no longer at issue with respect to Liberty's liability for Narum's medical and hospital benefits, because of the terms of the settlement agreement. The WCC noted that all the doctors who examined Narum offered their opinions as to whether he would need hip surgery, and the extent to which Narum's hip condition was caused by the industrial accident. Liberty knew these facts going into the settlement discussions, and made a decision to settle Narum's claim knowing that hip replacement surgery might be required at some point in the future. In fact, the language of the settlement itself explicitly contemplated such a possibility. *See* ¶ 11. The WCC concluded that Liberty was bound by the terms of this agreement under basic principles of contract law, and further, that Liberty was not in a position to accept liability for the

9

claim, settle it, and then "un-accept" the claim at a later date because it changed its mind. Accordingly, the WCC found that Liberty was responsible for medical and hospital benefits related to Narum's hip surgery and treatment based on the settlement agreement.

¶19 Additionally, the WCC concluded that Narum was entitled to reasonable attorney fees and costs pursuant to § 39-71-611, MCA, because Liberty denied the claim, the WCC later determined it was compensable, and because its actions in denying the claim were unreasonable. With respect to the unreasonableness of Liberty's actions in denying the claim, the WCC noted that Liberty had been paying benefits for years, then suddenly stopped paying them without notifying Narum, and denied payment for the hip surgery in spite of the fact that it was specifically contemplated by the settlement. The WCC concluded that Liberty had failed to provide a persuasive explanation for how it could justify the cessation of payments under these circumstances. Finally, the WCC determined that Narum was entitled to a 20% statutory penalty under § 39-71-2907, MCA, based on Liberty's unreasonable refusal to pay medical benefits.

¶20 Liberty now appeals from the WCC's decision, presenting four issues on appeal. First, Liberty maintains that the WCC erred in holding that the causation of the hip condition was not at issue based on the terms of the settlement agreement, and asserts that under the Workers' Compensation Act Narum must still prove causality before it can be found liable for benefits, irrespective of the language in the settlement. Second, Liberty argues that Narum failed to introduce substantial evidence proving that his injury caused him to require hip surgery. Third, Liberty argues that it did not unreasonably deny liability and that the statutory penalty should be reversed. Fourth, Liberty maintains that

the WCC erred in awarding attorney fees because it did not unreasonably deny liability for his hip replacement surgery.

¶21 We conclude that Narum met his burden of proof in this case and showed that his industrial accident caused the need for his hip replacement surgery and other treatment for the hip condition both before and after the surgery. Accordingly, we decline to address Liberty's first issue. Thus, we restate the issues on appeal as follows:

¶22 **Issue One:** *Did Narum satisfy his burden of proof and demonstrate that his industrial accident caused him to require hip replacement surgery and other related treatment for his hip condition?*

¶23 **Issue Two:** *Did the WCC err in awarding attorney fees and costs in this case?*

¶24 **Issue Three:** *Did the WCC err in awarding a statutory penalty based on Liberty's denial of Narum's claims?*

## STANDARD OF REVIEW

¶25 We review the WCC's findings of fact to determine whether they are supported by substantial credible evidence. *Kratovil v. Liberty Northwest Ins. Corp.*, 2008 MT 443, ¶ 13, 347 Mont. 521, 200 P.3d 71. Substantial credible evidence is such evidence which a reasonable mind could accept as adequate to support a conclusion. Evidence is considered substantial even if it is contradicted by other evidence, somewhat less than a preponderance, or inherently weak. *Kratovil*, ¶ 13. We conduct a de novo review of the WCC's conclusions of law to determine if they are correct. *Kratovil*, ¶ 13.

¶26 **Issue One:** *Did Narum satisfy his burden of proof and demonstrate that his industrial accident caused him to require hip replacement surgery and other related treatment for his hip condition?*

11

¶27 Liberty argues that the WCC impermissibly ignored Narum's statutory burden of proof to show that his industrial accident caused him to require hip surgery, and instead turned the resolution of this case into a credibility contest between Dr. Willis and Narum. The point of dispute here for Liberty concerns the WCC's finding that Dr. Willis misapprehended whether or not Narum was pain-free after his accident, and whether the industrial accident led to the hip replacement surgery. Liberty asserts that Dr. Willis' deposition established that his degenerative joint disease had a natural progression which led to the surgery and related treatment. As noted above at ¶ 16, however, the WCC found that Dr. Willis had misapprehended Narum's condition by concluding that Narum experienced "interims of very little, if no pain." Based on Narum's testimony, as well as the evidence in the medical records, the WCC concluded that Narum's pain in his left his hip was attributable to his industrial accident, as it led to the ongoing pain in his left hip. Liberty asserts this was error and that if the WCC discounts Dr. Willis' opinion, then there is essentially no medical evidence demonstrating that Narum's hip surgery and related treatments were more probably than not due to his industrial accident.

¶28 Under § 39-71-407(2)(a)(ii), MCA, an insurer is liable for an injury "if the injury is established by objective medical findings and if the claimant establishes that it is more probable than not that . . . a claimed injury aggravated a preexisting condition." The claimant has the burden of proving by a preponderance of the evidence that he sustained an injury on the job, and that there is a casual connection between his current condition

and his injury. *Best v. State Compensation Ins. Fund*, 276 Mont. 302, 305, 916 P.2d 108, 110 (1996).

¶29 The WCC came to the conclusion that Narum's industrial accident aggravated his preexisting degenerative condition based on Narum's testimony and the medical records of the other treating physicians, including Dr. Ross. A review of the record in this case shows that the WCC's conclusion was supported by substantial credible evidence. First, Dr. Willis' opinion itself is somewhat contradictory on the question of whether Narum's industrial accident led to surgery and treatment for the hip. As noted above at ¶ 9, in his November 18, 2003 letter, Dr. Willis stated that Narum's "injury has been disconnected from his Workers Compensation Claim, as it was more than likely a pre-existing condition, exacerbated by work. Mr. Narum has significant hip pain, which has since the time of this injury, limited his ability to return to work, and he really feels that he is unable to return to the form of work which he was doing prior to this exacerbation." Even though he states that Narum's injury is "disconnected" from his claim, by implying that Narum had experienced significant hip pain since the time of the accident, Dr. Willis appears to verify that the liability criteria under § 39-71-407(2)(a)(ii), MCA, and Narum's burden of proof with respect to causality, have in fact been satisfied. Moreover, all the other medical professionals—including Dr. Ross and Dr. Schabacker, who performed an IME—as well as Narum, whom the WCC found credible, agreed that Narum was asymptomatic before the industrial accident, and that, since the accident, he has seen a steady degeneration of his condition and increasing pain. This provided substantial evidence for the WCC to conclude that the industrial accident exacerbated his

13

degenerative condition leading to ongoing pain, thus requiring surgery and other treatment.

¶30 Liberty implies that the WCC had no choice but to follow certain portions of Dr. Willis' opinion simply because he was the treating physician. However, "a treating physician's opinion is not conclusive. To presume otherwise would quash the role of the fact finder in questions of an alleged injury. The Workers' Compensation Court, as the finder of fact, is in the best position to assess witnesses' credibility and testimony. It is the function of a finder of fact to weigh the credibility of both non-medical and medical evidence." *EBI/Orion Group v. Blythe*, 1998 MT 90, ¶ 13, 288 Mont. 356, 957 P.2d 1134 (quotation and citation omitted). Liability, of course, can only be established based upon "objective medical findings" pursuant to § 39-71-407(2), MCA. The record indicates that such objective medical findings were present in this case, and that the WCC's findings of fact were supported by substantial credible evidence.

¶31 Thus, we conclude that Narum met his statutory burden of proof and demonstrated that his need for hip surgery and other treatments for his left hip were directly caused by the industrial accident which aggravated his pre-existing degenerative condition. Thus, Liberty is liable to Narum for the related medical and hospital costs, including treatments before the surgery, the surgery itself, and any post-surgical care or treatment. While the WCC based its determination of liability primarily upon the terms of the settlement, we decline to resolve Liberty's liability on that ground because the WCC provided ample factual findings for us to conclude that Narum has demonstrated that his industrial accident aggravated his pre-existing hip condition. Because the WCC reached the right

14

result, we affirm its decision even though we do not fully adopt its reasoning. *See Wells Fargo Bank v. Talmage*, 2007 MT 45, ¶ 23, 336 Mont. 125, 152 P.3d 1275 (stating that we will affirm a court's decision even if it reaches the right result for the wrong reason).

¶32   **Issue Two:** *Did the WCC err in awarding attorney fees and costs in this case?*

¶33   Under § 39-71-611, MCA, an insurer can be held liable for reasonable attorney fees if the insurer denies liability for a compensation claim, the claim is later judged compensable, and the WCC determines that the insurer's actions in denying liability were unreasonable. Because Liberty denied liability and we conclude that it is liable, we now turn to the question of whether the WCC erred in concluding that Liberty's actions in denying Narum's claim were unreasonable.

¶34   The WCC's finding with respect to the reasonableness of Liberty's actions in denying Narum's claim is an issue of fact, subject to the substantial evidence standard of review. *Taylor v. State Compensation Ins. Fund*, 275 Mont. 432, 441, 913 P.2d 1242, 1247 (1996). The WCC concluded that Liberty's actions in denying Narum's claim were unreasonable for several reasons. First, it noted that Liberty stopped paying for ongoing medical treatment after it had previously accepted liability and had already paid for medical benefits related to Narum's hip condition for years. Furthermore, Liberty never informed Narum that it would stop paying for the injections he was receiving; Narum only learned of Liberty's refusal to pay when his medical provider contacted him. With respect to the hip replacement surgery, the WCC found that Liberty denied payment for this benefit even though the settlement agreement specifically identified hip replacement surgery as a possibility acknowledged by the parties. Finally, the WCC found that

15

Liberty simply provided no persuasive explanation as to how it could justify stopping payment for Narum's ongoing treatment under these circumstances.

¶35 Liberty argues the WCC erred in finding that its actions in denying Narum's claims were unreasonable. We disagree. Liberty's main argument against the WCC's finding of unreasonableness is that it had a genuine legal and medical doubt that it was liable based Dr. Willis's opinion. However, we agree with the WCC that this still does not explain why it agreed originally to pay for Narum's hip surgery in the settlement, or why it suddenly stopped paying Narum benefits for injections for his hip after initially accepting liability for Narum's condition. These were key facts in support of the WCC's finding of unreasonableness, and they are supported by substantial credible evidence. Thus, we conclude the WCC did not err in finding that Liberty's actions in denying Narum's claims were unreasonable and awarding attorney fees and costs in his favor.

¶36 **Issue Three:** *Did the WCC err in awarding a statutory penalty based on Liberty's denial of Narum's claims?*

¶37 Under § 39-71-2907, MCA, the WCC may increase by 20% the full amount of benefits due to a claimant during the period of delay or refusal to pay if the insurer's delay or failure to pay is unreasonable. In awarding this penalty, the WCC incorporated its finding of unreasonableness from its analysis under the attorney fees and costs issue discussed above. Because we have affirmed the finding of unreasonableness as based on substantial credible evidence under issue two, we affirm the award of the statutory penalty as well.

16

¶38 The Dissent disagrees with our imposition of attorney fees and a statutory penalty, asserting that Liberty had a legitimate legal right to contest causation for future medical expenses. In this connection, the Dissent faults the Court for falling back upon the settlement agreement to justify the fees and the penalty, after having declined to resolve the case on the basis of that agreement. Dissent, ¶¶ 41, 42. Respectfully, the Court's rationale is not internally inconsistent. While we declined to resolve the case on the basis that the settlement agreement was dispositive of liability for medical bills irrespective of causation, we need not ignore the fact that the settlement agreement exists, that Liberty did agree in that document to reserve further medical and hospital benefits, and that Liberty specifically contemplated the prospect of total hip replacement in the future. This is but one fact, together with Liberty's cessation of payment for medical benefits without notice to Narum premised upon a "true/false" questionnaire answer, of which the WCC took account in assessing fees and the penalty. We in turn properly take account of this fact, and others, in affirming the WCC's decision to award fees and the penalty.

## CONCLUSION

¶39 While we decline to adopt the exact reasoning of the WCC and decline to decide this case solely on the terms of the settlement, we nonetheless affirm its decision. We conclude that, based on the WCC's findings of fact which are themselves based upon substantial credible evidence, Narum has met his burden of proof and demonstrated that the industrial accident aggravated his degenerative hip condition, and caused him to require treatment and surgery for his left hip. Finally, we conclude that the WCC's finding that Liberty acted unreasonably in denying his claim was also based on

17

substantial credible evidence, and thus affirm the award of reasonable attorney fees and costs, as well as the 20% statutory penalty.


/S/ PATRICIA COTTER


We concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS


Justice Jim Rice concurring in part and dissenting in part.

¶40    I concur with the result the Court reaches under denominated Issue One.  Although the evidence was contradictory, the conclusions entered by the WCC with regard to the cause of Narum's hip replacement were supported by substantial evidence.  However, it is noteworthy that the WCC, in reaching its conclusions, had to discount the opinion of Dr. Willis, Narum's treating physician, by determining that Dr. Willis had "misapprehended" Narum's condition.  This, to say the least, is a rare conclusion within worker's compensation jurisprudence, which usually gives substantial weight to and relies upon the treating physician's opinions.  *See Nielson v. State Compen. Ins. Fund*, 2003 MT 95, ¶ 39, 315 Mont. 194, 69 P.3d 1136 ("As a general rule, testimony of a treating physician is entitled to greater evidentiary weight than that of other doctors.").

18

Though I agree with the WCC's conclusions with regard to causation of Narum's hip replacement, I believe that the WCC's discounting of Dr. Willis's opinion bears consideration in the resolution of the attorney fee and penalty issues.

¶41 Concluding that Narum met his evidentiary burden of proof to establish causation, the Court states it will not address Liberty's first issue—whether the WCC erred by concluding that causation for the hip replacement was "no longer an issue in this case" under the parties' settlement agreement. However, though this issue may not be necessary to resolve Narum's entitlement to reimbursement, the WCC's determination that causation was no longer an issue was also the reason it penalized Liberty for contesting the expense. The WCC reasoned that "Respondent denied payment . . . even though medical benefits were reserved and the possibility of hip replacement surgery was *specifically* identified in the settlement agreement. Respondent has provided this Court with no persuasive explanation as to how it could justify stopping payment for the ongoing treatment of Petitioner's hip condition for which it had accepted liability." (Emphasis in original.) The answer to this question would be that, though accepting liability for the injury, Liberty believed it had a legitimate causation defense to future medical claims and had not agreed to a blanket acceptance of all such costs. Thus, I believe a review of the causation issue is likewise important to resolution of the attorney fee and penalty matters.

¶42 As it turns out, so does this Court. In affirming the WCC's imposition of attorney fees and the 20% penalty, the Court turns back on its initial decision not to address the causation issue, reasoning that Liberty's reliance upon Dr. Willis's opinion "does not

2

explain why it agreed originally to pay for Narum's hip surgery in the settlement, or why it suddenly stopped paying Narum benefits for injections for his hip after initially accepting liability for Narum's condition." *Opinion*, ¶ 35. The Court here is actually affirming the WCC's determination that causation no longer remained an issue because liability had been accepted.

¶43 I disagree with the WCC's conclusion that causation for Narum's hip replacement was "no longer an issue" under the settlement agreement. Of course, if that were the case, there would be no need to analyze the evidence to determine if Naurm's work injury had caused the surgery—the issue would be settled as a matter of law. The Petition for Settlement, which constitutes the settlement agreement approved by the Department of Labor and Industry, provided that Narum was reserving further medical and hospital benefits, and then stated as follows:

> The **claimant understands** that by entering into a settlement, both the insurer and the claimant agree to assume the risk that the condition of the claimant, as indicated by reasonable investigation to date, may be other than it appears or may change in the future. Specifically, the parties acknowledge that the claimant may require a total hip replacement in the future. Additionally, the parties ackknowledge (sic) that based on claimant's age and physical restrictions, his return to work poetnetial (sic) is and will continue to be limited. The **claimant . . . further understands** that if this Petition is approved, this insurer is forever released from payment of compensation under the Worker's Compensation and Occupational Disease acts for injuries or diseases specified above. The **claimant understands** this Petition represents a settlement and, if approved, may not be reopened by the Department. [Emphasis in original.]

As it states, this language is intended to make sure that the parties, in entering a final settlement which the Department may not reopen, understood that Narum's condition may "change in the future." That understanding holds a consequence for both sides: if

3

Narum gets worse, Narum will have settled for too little; if Narum improves, Liberty will have paid too much. Either way, the agreement explains that the party suffering the financial loss would have no recourse. This language is directed toward disability compensation issues, and is bolded in the original agreement to ensure the claimant understands he will be ineligible for future disability compensation payments if he gets worse, including, as it explains, suffering from a limited work potential or requiring a total hip replacement. This language does not expand upon Liberty's responsibility for future medical costs—which Narum clearly reserved in the agreement—and does not provide that Liberty is waiving the right to contest causation for those future costs. Further, it does not say, as the Court offers, that Liberty "agreed originally to pay for Narum's hip surgery in the settlement." *Opinion*, ¶ 35. As Liberty notes, the statutory requirement that Narum demonstrate his entitlement to medical benefits by a preponderance of the evidence remained applicable. Sections 39-71-407 and 704, MCA (2001). The WCC reasoned that Liberty "cannot accept liability for a claim, settle the claim, and then un-accept the claim at a later date because it has changed its mind about whether it should have accepted liability in the first place." I do not believe Liberty did so.[1]

¶44 Liberty alternatively argues that if the agreement is deemed to be ambiguous, this case should be remanded for further proceedings in which extrinsic evidence could be considered. However, we need not reach a final conclusion about the agreement's

---

[1] The Department of Labor & Industry's letter to Liberty notifying them that the Department had approved the settlement agreement stated that "[t]he insurer will, where applicable, make payment."

4

interpretation for purposes of the attorney fee and penalty issues. From the agreement's plain language, discussed above, I believe Liberty had a legitimate legal position that it had not waived the right to contest causation for future medical costs, including the hip replacement. Further, I believe that Liberty had a legitimate medical premise for questioning whether Narum's hip replacement was related to his work accident, by the opinion of Narum's treating physician, Dr. Willis.

¶45 We have explained that the statutory penalty "was never intended to eliminate the assertion of a legitimate defense to liability" and that "the existence of a genuine doubt, from a legal standpoint, that any liability exists constitutes a legitimate excuse for denial of a claim or delay in making payments." *Marcott v. Louisiana Pacific Corp.*, 275 Mont. 197, 205, 911 P.2d 1129, 1134 (1996). I believe the WCC's imposition of attorney fees and 20% penalty was premised upon incorrect legal assumptions and was not reasonable. I would reverse under Issues Two and Three.

/S/ JIM RICE

5