

DA 08-0414

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 218

DAVID TINKER,

        Petitioner, Appellee and
        Cross-Appellant,

   v.

MONTANA STATE FUND,

        Respondent, Appellant and
        Cross-Appellee.

APPEAL FROM:    Montana Workers' Compensation Court, WCC No. 2007-2018
                      Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Greg E. Overturf, Montana State Fund, Helena, Montana

        For Appellee:

            Richard J. Martin, Linnell, Newhall, Martin & Schulke, P.C.,
            Great Falls, Montana

                            Submitted on Briefs:  May 20, 2009

                                       Decided:  June 24, 2009

Filed:

            _____
                          Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Montana State Fund (State Fund) appeals from a decision of the Workers' Compensation Court (WCC) holding that petitioner David Tinker (Tinker) is entitled to the acceptance of a workers' compensation injury claim for a degenerative condition in his left hip. Tinker cross-appeals from the portions of the WCC's decision denying his occupational disease claim for his left hip, and his claims for an award of attorney fees and a statutory penalty based on State Fund's denial of his claims. We deny State Fund's appeal and Tinker's cross-appeal, and affirm the decision of the WCC.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     Tinker began working for Harman Construction in Great Falls, Montana, in approximately 1989. During the time Tinker worked there, the company did primarily concrete work and Tinker's job duties included being a foreman, laborer and form-setter. A significant amount of Tinker's work involved heavy-duty labor.

¶3     Sometime in June 2005, Tinker suffered an injury at work. He was setting a foundation, when he slipped on an oiled surface, did a split, and then fell on his left hip. Tinker rested briefly after the fall, finished his work shift, and reported it to his boss. At the time, Tinker did experience some pain from the fall, but did not give the injury much thought. From the day of the injury forward, Tinker had some pain in his left hip which would come and go. Tinker did not seek medical treatment for his injury, as he did not tend to be a "complainer," could not afford to take time off work, and assumed that the injury would eventually heal of its own accord.

2

¶4 In spite of his hip pain, Tinker continued in the same job position with the same job duties. By the beginning of 2007, however, the pain had increased to the point where Tinker had difficulty getting in and out of a vehicle and performing his job. Tinker was also experiencing sharp pains in his hip and knee which prevented him from sleeping at night and limited his ability to walk around work sites. On July 24, 2007, Tinker saw Dr. Loy L. Anderson (Dr. Anderson) for an evaluation of his hip and knee pain. Dr. Anderson took x-rays of Tinker's hip and determined he had a severe degenerative condition which might require surgery. Tinker indicated to Dr. Anderson that the pain in his hip began with the slip and fall injury roughly two years prior.

¶5 Tinker saw Dr. Anderson for a follow-up appointment on August 23, 2007. Dr. Anderson noted that the x-rays taken at the previous visit did not indicate any problems with Tinker's knee but did show severe degenerative changes in his left hip. At that time, Dr. Anderson opined that Tinker's degenerative condition was likely caused by his industrial accident. Dr. Anderson informed Tinker that he needed a hip replacement.

¶6 After his second visit with Dr. Anderson, Tinker continued working at Harman Construction. Tinker subsequently decided to file a workers' compensation claim with State Fund, and Tinker contacted State Fund and explained to an adjuster that he wished to file a claim. Although Tinker could not remember the precise date of his industrial accident, he and the claims adjuster agreed to fix the date of his injury as June 15, 2005. Tinker signed a report of his injury on August 10, 2007, and submitted his claim to State Fund.

¶7     Within a week after filing his claim, State Fund informed Tinker that it would be denied on the grounds it had not been filed within 12 months of the injury as required under the Workers' Compensation Act (Act). On August 28, 2007, Tinker filed another claim with State Fund, this time indicating that he suffered an occupational disease of his hips, with an injury date of July 24, 2007.

¶8     Dr. Ronald M. Peterson conducted an independent medical examination (IME) of Tinker on February 20, 2008. Dr. Peterson opined that Tinker's left hip condition started with the June 2005 accident, and that it was unlikely to have been caused by any inflammatory diseases. Dr. Peterson classified the condition as traumatic osteoarthritis secondary to a fall and stated that Tinker would not have had this condition but for the June 2005 fall. He further opined that Tinker's condition progressed as rapidly as it did because of the heavy-duty nature of his job. In conclusion, Dr. Peterson recommended that Tinker receive a total hip replacement, and that the need for this surgery was due to the natural progression of the June 2005 industrial injury. State Fund ultimately denied Tinker's occupational disease claim.

¶9     On December 24, 2007, Tinker filed a petition for a trial before the WCC, challenging State Fund's denial of his claims and seeking attorney fees, costs, and a statutory penalty based on State Fund's denial. A trial was held on May 29, 2008, in Great Falls. On July 7, 2008, the WCC issued its written ruling, holding that Tinker was entitled to acceptance of his workers' compensation injury claim for his left hip condition, as well as costs incurred in this matter. The WCC denied Tinker's claim for an

4

occupational disease for his left hip condition, as well as his claims for attorney fees and a statutory penalty.

¶10 In its order, the WCC stated that there was no factual controversy concerning Tinker's injury or the results of the medical evaluations. Instead, the controversy concerned whether Tinker's hip condition was compensable as either an industrial injury or an occupational disease. The WCC noted that State Fund denied Tinker's injury claim because he did not file it within 12 months of its occurrence as required under § 39-71-601, MCA (2005). Tinker argued to the WCC that his claim should either be compensable as an occupational disease, or that the WCC should find the 12-month filing period for his injury claim was waived pursuant to § 39-71-601(2), MCA (2005).

¶11 In its analysis, the WCC began by denying Tinker's claim for an occupational disease for his left hip condition. The WCC then considered whether Tinker's claim for an industrial injury should be accepted. Tinker asserted that he was not time-barred from pursuing this claim because he did not seek medical attention and actually learn that he might have a compensable injury until July 24, 2007. The WCC noted that § 39-71-601(2), MCA (2005), allows an insurer to waive the normal 12-month time requirement for filing a complaint upon a showing by the claimant of lack of knowledge of disability, latent injury, or equitable estoppel. Although the WCC noted that this statute appeared to vest the insurer with discretion to grant the waiver, the WCC reasoned that the waiver requirement is not discretionary if the claimant otherwise qualifies for it under the statute.

5

¶12    The WCC then went on to note that the statutory provision providing for a waiver of the normal time requirement has been a part of the Act since 1973, with the latent injury and equitable estoppel criteria codified in 1989. In its application of this statute the WCC first observed that Tinker had not set forth evidence for the application of equitable estoppel. The WCC also concluded that Tinker did not meet the latent injury exception under the authority of *McGuin v. State Compen. Ins. Fund*, 1999 MTWCC 82, because he knew at the time of his industrial accident that he suffered an injury.

¶13    The WCC then considered whether the 12-month requirement for filing Tinker's claim could be waived under the "lack of knowledge of disability" exception. The WCC noted that the applicability of this exception had been discussed by this Court in two previous cases, *Pinion v. H.C. Smith Const. Co.*, 190 Mont. 103, 619 P.2d 167 (1980), and *Conn v. Quality Inn*, 242 Mont. 190, 789 P.2d 1213 (1990). In *Pinion*, claimant Lester Pinion (Pinion) suffered an on-the-job injury on May 31, 1978. *Pinion*, 190 Mont. at 104, 619 P.2d at 167. Although Pinion reported the injury, he did not seek medical treatment until August 1979, at which point a surgeon recommended knee surgery. After the surgery, Pinion was unable to earn wages and filed a workers' compensation claim on September 17, 1979. *Pinion*, 190 Mont. at 104, 619 P.2d at 167. The Workers' Compensation Division waived the one-year filing period, allowed the claim, and the insurer appealed. Without any significant analysis, this Court upheld the decision stating that Pinion had made a reasonable showing that he lacked knowledge of his disability, and that there was substantial credible evidence in the record to support the decision of the Workers' Compensation Court.

6

¶14    In *Conn*, claimant Anita Conn (Conn) suffered injuries to her back and hip while working as a maid at the Quality Inn in Missoula, Montana. *Conn*, 242 Mont. at 191, 789 P.2d at 1213. Sometime between January and March of 1986 she tripped over a vacuum cleaner cord, injuring her back and hip. In June 1987, she tripped over a bedspread injuring the same area. Although the injuries did not cause her to miss work, she suffered sporadic pain which increased after the second injury. Shortly after the second injury, Conn sought medical help. While her condition initially responded to treatment, in the summer of 1988 her workload increased significantly and the pain returned with greater severity. *Conn*, 242 Mont. at 191, 789 P.2d at 1214. In November 1988, Conn quit her job upon her doctor's advice.

¶15    On November 4, 1988, Conn filed a workers' compensation claim for the second accident, and on December 21, 1988, filed a claim for the first accident. Both claims were filed after the 12-month period and were denied by the Workers' Compensation Division. Conn appealed to the WCC, which reversed the Division's decision and held that the existence of a "disability" is determined in relation to a loss of earnings occasioned by the injury. *Conn*, 242 Mont. at 192, 789 P.2d at 1214. State Fund appealed the WCC's decision to this Court, and we affirmed. In affirming the WCC, we conducted a review of the 1985 version of the Act, analyzing the plain meaning of the term "disability" as used therein. *Conn*, 242 Mont. at 192-93, 789 P.2d at 1214-15. Our review of the term "disability" as used in the Act, left us "no doubt" that the Legislature intended that "a disability occurs only when the claimant suffers a loss in the ability to

engage in gainful employment. The definitive indicator of a loss in ability is a loss in wages, present or future." *Conn*, 242 Mont. at 193, 789 P.2d at 1215.

¶16 With these cases in mind, the WCC turned to a consideration of the meaning of the term "disability" in the 2005 version of the Act. State Fund had argued to the WCC that *Pinion* and *Conn* were inapplicable because they were decided under earlier versions of the Act, which at the time required courts to liberally construe the Act in the claimant's favor. The WCC noted that the "liberal construction" statute had been removed by the time of Tinker's claims, but concluded that while the Court relied upon this doctrine in *Pinion*, it played no role in the decision in *Conn*. The WCC then went on to note that in 1995 the Legislature moved the definition of the term "disability" from § 39-71-116(9), MCA, where it defined the term for the entire chapter, to § 39-71-116(29)(b), MCA,[1] where it defined the term solely in relation to "secondary medical services." Under the 2005 version of the Act, therefore, there is no stand-alone definition of "disability."

¶17 The term "disability" itself is defined in relation to secondary medical services as:

> a condition in which a worker's ability to engage in gainful employment is diminished as a result of physical restrictions resulting from an injury. The restrictions may be combined with factors, such as the worker's age, education, work history, and other factors that affect the worker's ability to engage in gainful employment.

Section 39-71-116(30)(b)(i), MCA (2005).

¶18 Additionally, the Legislature revised the statutory definition of "disabled worker" to read as follows:

---

[1] This section was later moved to § 39-71-116(30)(b), MCA (2005).

8

"Disabled worker" means a worker who has a permanent impairment, established by objective medical findings, resulting from a work-related injury that precludes the worker from returning to the job the worker held at the time of the injury or to a job with similar physical requirements and who has an actual wage loss as a result of the injury.

Section 39-71-1011(2), MCA (2005).

¶19    With these provisions mind, the WCC concluded that:

It is unclear from the legislative history exactly why the general definition of disability was moved from a stand-alone definition to a definition applying only to "secondary medical services." What is clear, however, is that the legislature made a concerted effort to revise *all* the statutes which reference some sort of "disability" so that they require a wage loss or inability to perform one's time-of-injury job as an element of each definition. Although the precise language of the statutes has changed since *Pinion* and *Conn* were decided, the statutes which reference "disability" all still indicate that loss of wages or loss of earning ability is necessary for a worker to be considered to have a "disability" under the Act.

¶20    Applying this legal conclusion to the facts before it, the WCC concluded that Tinker lacked knowledge of his disability until July 24, 2007, when he sought medical treatment because his injury was preventing him from performing his job duties. Accordingly, the WCC concluded that Tinker's claim qualified for the waiver of the time limitation pursuant to § 39-71-601(2)(a), MCA, and was therefore compensable under the Act.

¶21    Finally, although the WCC concluded that Tinker, as the prevailing party, was entitled to his costs, it denied Tinker's claims for attorney fees and a statutory penalty, finding that State Fund's actions in denying Tinker's claims were not unreasonable because its liability in this case was not clear cut.

9

¶22 State Fund now appeals from this decision. As noted above, Tinker cross-appeals the denial of his claim for an occupational disease, as well as his claims for attorney fees and a statutory penalty. Because we are affirming the WCC's decision that Tinker has a compensable injury, we will not address Tinker's challenge to the denial of his occupational disease claim. Thus, we state the issues presented on appeal as follows:

¶23 **Issue One:** *Did the WCC err in concluding that Tinker's workers' compensation claim was not time-barred?*

¶24 **Issue Two:** *Did the WCC err in concluding that State Fund's denial of Tinker's claim was not unreasonable?*

## STANDARD OF REVIEW

¶25 We review the WCC's findings of fact to determine if they are supported by substantial credible evidence. *Fleming v. Intl. Paper Co.*, 2008 MT 327, ¶ 17, 346 Mont. 141, 194 P.3d 77. We review the WCC's conclusions of law de novo to determine if they are correct. *Narum v. Liberty Northwest Ins. Corp.*, 2009 MT 127, ¶ 25, 350 Mont. 252, 206 P.3d 964.

## DISCUSSION

¶26 **Issue One:** *Did the WCC err in concluding that Tinker's workers' compensation claim was not time-barred?*

¶27 State Fund argues that under the 2005 version of the Act, a claimant's knowledge of his disability does not require that the claimant is unable to work or that he suffers a wage loss on account of his condition. State Fund argues that the definition of disability under the 2005 Act contemplates that a worker can be suffering from a disability even if

10

he is continuing in employment and earning wages equal to what he earned at the time he was injured—regardless of whether he suffered restrictions, limitations, or medical impairments. In other words, State Fund argues that the determination of the existence of a "disability" under the Act is not contingent upon a loss of wages. State Fund asserts that the Act's provisions relating to compensation for temporary total disability (TTD) benefits, permanent total disability (PTD) benefits, and temporary partial disability (TPD) benefits, demonstrate that under the 2005 Act a person can be considered "disabled," yet have suffered no wage loss. Thus, so long as Tinker was aware of his condition, even if he continued to work and suffered no wage loss, he was aware of his disability.

¶28    State Fund argues that the 2005 Act takes a more general view of the term "disability" and that the majority view of dictionaries defining this term support the position that disability is measured in terms of an individual's capacities, not with respect to an individual's experience of a wage loss. State Fund also asserts that the impairment rating guides that are utilized under the 2005 Act do not define disability with respect to a diminution of wages or inability to work. Additionally, State Fund argues that both *Pinion* and *Conn* are inapplicable, and that the WCC erred in relying upon them. Accordingly, State Fund asserts that the WCC erred in holding that Tinker's claim was not time-barred. State Fund asserts that if Tinker had knowledge of a physical or mental impairment that interfered with or prevented a normal achievement in a particular area, then he had knowledge of his disability, irrespective of any wage loss. Since the record demonstrates that he had such knowledge, State Fund argues the WCC's decision should be reversed.

11

¶29 Tinker argues that the WCC's interpretation of the term "disability" was correct and its decision should be affirmed. Tinker argues that the term disability as used in the 2005 Act requires that a claimant be aware that his impairment or condition occasions some form of wage loss before the claimant can be said to have knowledge of a disability. In this case, even though Tinker was affected by his injuries, he continued to work, did not experience a decrease in wages, and thus did not become aware of his "disability" until July 24, 2007, when he finally sought medical treatment. Tinker asserts that the definition of "disability" relied upon by the WCC is consistent with other jurisdictions and the use of the term in other benefit programs, such as Social Security, that provide compensation to those with disabilities. Tinker argues that the concept of a wage loss is at the essence of the term "disability" as used in those portions of the 2005 Act regarding the various types of benefits available to injured workers.

¶30 When interpreting statutes, we look first to their plain language in order to give effect to the intent of the Legislature in enacting them. *West v. Club at Spanish Peaks, L.L.C.*, 2008 MT 183, ¶ 89, 343 Mont. 434, 186 P.3d 1228. "Moreover, when interpreting statutes we view them as part of a whole statutory scheme, and construe them so as to forward the purpose of that scheme." *Vader v. Fleetwood Enterprises, Inc.*, 2009 MT 6, ¶ 30, 348 Mont. 344, 201 P.3d 139.

¶31 We affirm the WCC's interpretation of the term "disability" as used in the 2005 Act. The 2005 version of the Act does not contain a stand-alone definition of disability, but based on the Act's plain language, it is apparent that a "disability" is defined with reference to a worker's diminished capacity to work and earn wages. State Fund's

12

proposed construction of the term "disability" in an abstract sense divorced from the wage-earning context, simply does not find support in the plain language of the Act itself. For instance, the 2005 Act defines PPD and PTD as follows:

> (24) "Permanent partial disability" means a physical condition in which a worker, after reaching maximum medical healing:
> (a) has a permanent impairment established by objective medical findings;
> (b) is able to return to work in some capacity but the permanent impairment impairs the worker's ability to work; *and*
> *(c) has an actual wage loss as a result of the injury.*
> (25) "Permanent total disability" means a physical condition resulting from injury as defined in this chapter, after a worker reaches maximum medical healing, in which a *worker does not have a reasonable prospect of physically performing regular employment. Regular employment means work on a recurring basis performed for remuneration in a trade, business, profession, or other occupation in this state.* Lack of immediate job openings is not a factor to be considered in determining if a worker is permanently totally disabled.

Section 39-71-116(25), (26), MCA (2005) (emphasis added).

¶32 Along the same lines, a claimant is entitled to compensation for TTD benefits "when the worker suffers a total loss of wages as a result of an injury and until the worker reaches maximum healing; or . . . until the worker has been released to return to the employment in which the worker was engaged at the time of the injury or to employment with similar physical requirements." Section 39-71-701(1), MCA (2005). Furthermore, compensation for PPD benefits is available only when a worker shows an "actual wage loss as a result of the injury . . . ." Section 39-71-703(1)(a), MCA (2005). Finally, as noted by the WCC, the definition of a "disabled worker" is also inherently connected to an actual wage loss as the result of an impairment or condition. *See* Opinion, ¶ 18. The plain language of the Act clearly demonstrates that the term

13

"disability" is tied to a wage loss or impairment in the ability to earn wages through employment. Thus, until a claimant knows that he or she is suffering some form of wage loss as a result of an injury, condition, or impairment, then he or she lacks knowledge of their "disability" within the meaning of the Act.

¶33 Whether or not *Pinion* and *Conn* are still applicable is beside the point given the plain language of the 2005 Act. Furthermore, as noted by Tinker, treatises dealing with workers' compensation law, as well as the Social Security Act itself, both include wage loss as an inherent component of a disability determination. *See e.g.*, 82 Am. Jur. 2d, *Workers' Compensation* § 377, 348-49 (2003) (footnotes omitted) ("Disability," ordinarily means loss or impairment of earning power, or incapacity to earn, as distinguished from a physical infirmity."); 42 U.S.C. § 423(d)(1)(A) (defining disability in part as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."). In this connection, it is difficult to overlook the fact that the "objective of the Montana workers' compensation system is to provide, without regard to fault, wage-loss and medical benefits to a worker suffering from a work-related injury or disease." Section 39-71-105(1), MCA (2005). Thus, it should come as no surprise that a determination of whether a worker is "disabled" would of necessity be measured by reference to whether or not he or she suffered a loss of wages.

¶34 Finally, we note that Tinker has also challenged the WCC's conclusion that he did not suffer a latent injury and was therefore not entitled to a waiver of the 12-month filing

period on this basis under § 39-71-601(2)(b), MCA (2005). Since we are affirming the WCC's determination that Tinker's injury claim does qualify for the waiver under § 39-71-601(2)(a), MCA (2005), his challenge to the WCC's conclusion on this point appears to be moot.

¶35 **Issue Two:** *Did the WCC err in concluding that State Fund's denial of Tinker's claim was not unreasonable?*

¶36 In order to qualify for an award of attorney fees or a statutory penalty under the Act, Tinker must show that State Fund's actions in denying his claim were unreasonable. The WCC found that State Fund's actions were not unreasonable. The WCC's finding with respect to the reasonableness of State Fund's actions in denying Tinker's claim is an issue of fact, subject to the substantial evidence standard of review. *Narum*, ¶ 34. "Substantial credible evidence is such evidence which a reasonable mind could accept as adequate to support a conclusion. Evidence is considered substantial even if it is contradicted by other evidence, somewhat less than a preponderance, or inherently weak." *Narum*, ¶ 25. Tinker has failed to demonstrate that the WCC's findings on the issue of State Fund's actions in denying his claim were not supported by substantial credible evidence. Therefore, we affirm the WCC's denial of Tinker's claims for attorney fees and a statutory penalty.

## CONCLUSION

¶37 The WCC did not err in concluding that Tinker was entitled to compensation for his claim based on his injury of his left hip, since he lacked knowledge of this disability until July 24, 2007, when he first sought medical treatment because his injury was

15

preventing him from performing his job duties.  We further conclude that the WCC did not err in denying Tinker's occupational disease claim as well as his claim for an award of attorney fees and a statutory penalty.  Affirmed.


/S/ PATRICIA COTTER


We concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE