

DA 08-0336

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 217

ALAN RUSSELL,

       Petitioner and Appellee,

  v.

WATKINS & SHEPARD TRUCKING COMPANY,

       Respondent-Insurer and Appellant.

APPEAL FROM:    Montana Workers' Compensation Court, WCC No. 2006-1531
                 Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Leo S. Ward, Chad E. Adams, Browning, Kaleczyc, Berry & Hoven, P.C., Helena, Montana

       For Appellee:

              James G. Edmiston, Edmiston & Colton, Billings, Montana

                         Submitted on Briefs:  June 5, 2009

                              Decided:  June 24, 2009

Filed:

            _____
                        Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1　Watkins & Shepard Trucking Company (Watkins) appeals from a decision of the Workers' Compensation Court (WCC) granting the occupational disease claim of petitioner Alan Russell (Russell). Watkins is a self-insured employer enrolled under Compensation Plan I of the Montana Workers' Compensation Act. Russell had alleged that he was exposed to carbon monoxide while working as a truck driver for Watkins, and suffered cognitive impairment, liver failure, and jaundice as a result of these exposures. The WCC granted Russell's claim for occupational disease medical and indemnity benefits for his cognitive impairment, but did not specify the time period for which the indemnity benefits are awarded. Russell cross-appeals from the WCC's failure to specify the timeframe for the award of indemnity benefits, and asks this Court to fix the appropriate time period for his indemnity benefits. Watkins argues against the award of indemnity benefits in general, but also asserts that this Court cannot fix this time period for the award of indemnity benefits since to do so would require findings of fact which is not the province of an appellate court. We affirm the WCC's award of occupational disease medical and indemnity benefits to Russell for his cognitive impairment, but remand the timeframe issue to the WCC for further proceedings consistent with this Opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2　On or before October 24, 2002, Russell was employed by Watkins as an over-the-road semi-truck driver. During the course of working for Watkins, Russell claims he was exposed to carbon monoxide which entered the cab of the semi truck he regularly drove.

2

On several occasions, Russell complained to Watkins about being sick and exhaust smells penetrating the cab of the semi truck. On several occasions, Watkins had the truck repaired in order to address this condition, but Russell claims that the exhaust smell persisted.

¶3 Russell complained of a variety of symptoms, including numbness, headaches, fatigue, digestive problems, and other symptoms during the time he was driving for Watkins. He was eventually treated for some of these symptoms by Dr. Brian Fullerton beginning in June 2002. According to the WCC's findings of fact, Dr. Fullerton never arrived at a definitive answer for the source of these ailments. In October 2002, after driving cargo in the truck and continuing to experience various symptoms which he attributed to exhaust, Russell was admitted to an emergency room in Phoenix, Arizona. In early November 2002, Russell was treated by a Dr. Edward Hurley Charles at a hospital in Phoenix. Dr. Charles determined that Russell had suffered liver damage and jaundice, and performed gallbladder surgery on Russell. Dr. Charles was unable to opine whether any potential carbon monoxide poisoning could have caused this condition.

¶4 Russell was released from the hospital on November 2, 2002, but then readmitted four days later due to complications. At that time, Watkins' claims adjuster referred Russell's case to a medical management company, which in turn assigned the case to Kerry Stutzman (Stutzman), a registered nurse. Stutzman visited Russell in the hospital. At that time it was not known whether carbon monoxide poisoning was a factor in causing or aggravating Russell's medical problems. An attending physician suggested that Stutzman consult an environmental medicine specialist. Eventually, Stutzman

3

located Dr. Stuart Z. Lanson, a board-certified physician who specializes in otolaryngology and environmental medicine. Dr. Lanson then took over Russell's case. Initially, Russell complained of headaches, memory problems, dizziness, and swelling and discomfort in his extremities, as well as other symptoms. Dr. Lanson provided treatment to Russell and evaluated him for exposure to carbon monoxide. Dr. Lanson opined that Russell's liver condition was caused by carbon monoxide poisoning.

¶5 During Russell's course of treatment with Dr. Lanson, some of his conditions improved but he started to develop neuropathy, and cognitive dysfunction and short-term memory issues started to become apparent to Dr. Lanson. Dr. Lanson believed that Russell was experiencing toxic brain syndrome, or toxic encephalopathy. Russell eventually relocated to Phoenix so that he could continue receiving treatment with Dr. Lanson.

¶6 By October 2003, Russell had retained an attorney. On October 28, 2003, Dr. Lindell K. Weaver conducted an independent medical examination (IME) at the request of Russell's attorney. When Dr. Weaver evaluated Russell he was complaining of headaches, numbness in his feet, fatigue, clumsiness, depression, and some decision-making problems. After evaluating Russell, Dr. Weaver concluded that he could have had carbon monoxide-related damage. Dr. Weaver's examination also indicated symptoms associated with neuropathy. Additionally, Dr. Weaver noted that Russell suffered from severe hypothyroidism. Dr. Weaver traced the etiology of this condition to radiation therapy Russell had received for the treatment of non-Hodgkin's lymphoma in 1986. Dr. Weaver could not be certain of his diagnosis with respect to carbon monoxide

exposure, since hypothyroidism causes some of the same conditions, and in rare instances can cause neuropathy. On December 5, 2003, Dr. Weaver amended his report and incorporated findings from Russell's other medical examinations, and concluded that Russell's severe hypothyroidism could account for almost all of his symptoms and that he could not determine if any of Russell's problems were caused by exposure to carbon monoxide. Dr. Weaver then suggested repeating his evaluation once Russell's hypothyroidism condition was resolved.

¶7     Russell had also been evaluated by Dr. John Francis Foley of Salt Lake City, Utah, on October 30, 2003. While Dr. Foley determined that Russell did not have a classic history for carbon monoxide poisoning, he determined that it was possible that Russell had been exposed to chronic low-level carbon monoxide, and that his condition was consistent with low-level chronic carbon monoxide intoxication, although not clearly diagnostic of it. At a deposition given for the WCC on January 19, 2007, Dr. Foley concluded to a reasonable degree of medical certainty or probability that a carbon monoxide exposure had occurred. Dr. Foley also stated that given Russell's history, he could not suggest another specific disease which could account for the same constellation of symptoms.

¶8     On October 29, 2003, Russell was evaluated by Erin David Bigler, Ph.D. Dr. Bigler administered a neuropsychological evaluation. The results indicated short-term memory deficits, significant symptoms of depression, sleep disturbances and pain. A follow-up with Dr. Bigler occurred on November 23, 2004, which showed some

5

improvement in Russell's cognitive functions but also showed greater depression and anxiety.

¶9    Additionally, Dr. Emil J. Bardana was retained by Watkins to evaluate Russell and offer an expert opinion. Dr. Bardana issued a report on February 19, 2003, after reviewing Russell's medical records and medical history. Dr. Bardana concluded that Russell's exposure to carbon monoxide was unconfirmed and that there was no evidence suggesting Russell suffered from carbon monoxide intoxication. Dr. Bardana also stated that he was not aware of any controlled studies indicating that chronic carbon monoxide poisoning could cause brain or liver damage, and that from a general scientific standpoint it did not make sense that a chronic, low-level exposure could do so. Dr. Bardana pointed out, for instance, that smokers are exposed to low-level amounts of carbon monoxide, yet do not experience symptoms such as brain or liver damage. Dr. Bardana generally refuted the diagnoses of both Dr. Weaver and Dr. Lanson. He also suggested that Russell's symptoms could be caused by sleep apnea.

¶10   On July 10, 2006, Dr. Bardana issued a follow-up report based on further review of Russell's medical records and the opinions of the doctors who had examined and treated him. He was critical of Dr. Lanson's credentials and did not retreat from his view that Russell's condition was not due to carbon monoxide exposure. Dr. Bardana revised his assessment of Russell's condition to indicate its cause to be possible obstructive sleep apnea with hypersomnolence. In his report, Dr. Bardana also noted that Russell's potential sleep apnea condition had not yet been fully evaluated. On September 5, 2006,

6

Dr. Bardana issued another report based on an IME conducted by him on August 28, 2006. This report essentially affirmed Dr. Bardana's earlier conclusions.

¶11 Russell's hypothyroidism was subsequently treated by his regular physician, and Dr. Weaver re-evaluated his case in October 2006. At that time, Dr. Weaver opined that Russell suffered from conditions related to carbon monoxide exposure. Dr. Weaver opined that this exposure could have contributed to Russell's peripheral neuropathy, cognitive dysfunction, depression and anxiety. In a later deposition, Dr. Weaver admitted that although he had no absolute proof of carbon monoxide poisoning, the semi truck Russell drove needed repairs on many occasions and evidence was established indicating that exhaust had been entering the cab. Dr. Weaver noted that because there was a potential source of carbon monoxide poisoning, and Russell's symptoms seemed to appear at the time he was driving the semi truck, carbon monoxide poisoning was the likely cause of those symptoms.

¶12 Watkins also requested a review of Russell's case by Dr. Brent T. Burton. Dr. Burton opined that the evidence did not support a conclusion that Russell suffered from carbon monoxide poisoning. Dr. Burton opined that some sort of permanent impairment to brain function would not occur until the brain experiences hypoxia and the individual experiences a loss of consciousness. Dr. Burton opined that the evidence in this case did not support the conclusion that Russell suffered hypoxia and that it was unlikely he had a substantial exposure to carbon monoxide.

¶13 On February 12, 2007, the WCC held a trial on Russell's claims. The WCC received evidence and testimony from all Russell's treating and evaluating physicians,

7

primarily via depositions and the submission of exhibits. The WCC also received testimony from Russell and his daughter. Although the WCC found Russell to be a credible and sincere witness, it concluded it could not attribute all of his symptoms to carbon monoxide poisoning. Rather, the WCC concluded, based upon the medical records and opinions, that only Russell's cognitive impairments were caused by his work-related exposure to carbon monoxide. In this connection, the WCC found Dr. Weaver to be the most qualified medical expert, and relied upon his medical opinion that it was more probable than not that Russell's cognitive impairments were caused by his work-related exposure to carbon monoxide.

¶14 The WCC held that Russell, as the prevailing party, was entitled to his costs, but was not entitled to attorney fees or a statutory penalty based on Watkins' denial of Russell's occupational disease claim. Finally, although the WCC granted Russell's claims for medical and indemnity benefits for his occupational disease claim arising from his cognitive impairment, it did not specify the dates from which those benefits would accrue.

¶15 Watkins now appeals from the WCC's decision. Russell cross-appeals solely from the WCC's failure to set a specific timeframe for the award of indemnity benefits. We state the issues on appeal as follows:

¶16 **Issue One:** *Did the WCC err in relying upon Dr. Weaver's medical opinion?*

¶17 **Issue Two:** *Did the WCC err in failing to specify the time period for its award of indemnity benefits?*

## STANDARD OF REVIEW

8

¶18    "We review the WCC's findings of fact to determine whether they are supported by substantial credible evidence.  Substantial credible evidence is such evidence which a reasonable mind could accept as adequate to support a conclusion.  Evidence is considered substantial even if it is contradicted by other evidence, somewhat less than a preponderance, or inherently weak.  We conduct a de novo review of the WCC's conclusions of law to determine if they are correct."  *Narum v. Liberty Northwest Ins. Corp.*, 2009 MT 127, ¶ 25, 350 Mont. 252, 206 P.3d 964 (citing *Kratovil v. Liberty Northwest Ins. Corp.*, 2008 MT 443, ¶ 13, 347 Mont. 521, 200 P.3d 71).

## DISCUSSION

¶19    **Issue One:**  *Did the WCC err in relying upon Dr. Weaver's medical opinion?*

¶20    Watkins argues that the WCC erred in relying upon the medical opinion of Dr. Weaver in concluding that Russell proved his claim for occupational disease benefits based on his cognitive impairment.  Watkins argues that Dr. Weaver's methodology and rationale were flawed and did not meet the high standards required for the introduction of scientific testimony under the rules of evidence.  Watkins asserts that the WCC's reliance upon Dr. Weaver is contrary to a prior opinion of the WCC in *Bain v. Liberty Mut. Fire Ins. Co.*, 2004 MTWCC 45,[1] as well as *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

¶21    As we have previously held, "[a] party waives the right to appeal an alleged error when the appealing party acquiesced in, actively participated in or did not object to the asserted error."  *State v. Bomar*, 2008 MT 91, ¶ 33, 342 Mont. 281, 182 P.3d 47 (citing

---

[1] *Bain* was affirmed by this Court in an unpublished memorandum opinion.

9

*State v. Smith*, 2005 MT 18, ¶ 10, 325 Mont. 374, 106 P.3d 553). Failure to request a *Daubert* hearing on the admissibility of scientific testimony generally waives the right to challenge the reliability of such evidence on appeal. *Bomar*, ¶ 33. While Watkins certainly argued in the WCC that the court should rely upon its medical experts and not those offered by Russell, it never requested a *Daubert* hearing to challenge the reliability of Dr. Weaver's methodology, the bases for his opinions, or his qualifications as an expert witness. Accordingly, we will not consider this challenge for the first time on appeal.

¶22 Similarly, we reject the applicability of *Bain* as providing a basis for challenging the WCC's reliance upon Dr. Weaver's opinion for the first time on appeal. In *Bain*, the WCC set forth a non-exhaustive list of 10 factors that it generally considers when evaluating the causation issue based on conflicting or complicated medical testimony and evidence. *Bain*, ¶ 135. There is no indication, either in *Bain* or any other reported decisions of this Court, that strict compliance with these 10 factors is a precondition to the admissibility of medical testimony or evidence.

¶23 The WCC's factual findings are reviewed by this Court under the substantial credible evidence standard, and its conclusions of law are reviewed de novo for correctness. *Narum*, ¶ 25. Watkins has failed to demonstrate that the WCC's findings were not supported by substantial credible evidence or that its conclusions of law were in error. Instead, Watkins is asking this Court to reweigh the evidence before the WCC and come to a different conclusion. However, the " 'Workers' Compensation Court, as the finder of fact, is in the best position to assess witnesses' credibility and testimony. It is

10

the function of a finder of fact to weigh the credibility of both non-medical and medical evidence.' " *Narum*, ¶ 30 (quoting *EBI/Orion Group v. Blythe*, 1998 MT 90, ¶ 13, 288 Mont. 356, 957 P.2d 1134). Accordingly, we affirm the WCC.

¶24 **Issue Two:** *Did the WCC err in failing to specify the time period for its award of indemnity benefits?*

¶25 Russell cross-appeals from the WCC's failure to specify the time period for which he is entitled to indemnity benefits. As Watkins correctly notes, it is not this Court's function to act as a fact finder. In *Norwood v. Serv. Distribg., Inc.*, 2000 MT 4, 297 Mont. 473, 994 P.2d 25, we held that "where *potential* factual issues may still exist, those matters are best left for determination by the trier of fact on remand." *Norwood*, ¶ 54 (emphasis in original). Given the volume of medical evidence in this case, the various conditions for which Russell has received treatment, and the fact that the WCC awarded indemnity and medical benefits only for Russell's cognitive impairments, we conclude that the determination of the precise time period for the award of indemnity benefits is a factual issue that must be resolved by the WCC. Accordingly, we remand the determination of this matter to the WCC for further proceedings.

## CONCLUSION

¶26 We affirm the WCC's conclusion that Russell is entitled to medical and indemnity benefits for his occupational disease claim for cognitive impairment due to his carbon monoxide exposure while working for Watkins. We remand for a determination by the WCC of the appropriate time period for which indemnity benefits are due.

/S/ PATRICIA COTTER

11

We concur:

/S/ JOHN WARNER
/S/ JAMES C. NELSON
/S/ JIM RICE
/S/ BRIAN MORRIS