DA 11-0427

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 156

RICHARD FORD,

        Petitioner and Appellant,

   v.

SENTRY CASUALTY COMPANY,

        Respondent and Appellee.

APPEAL FROM:    Montana Workers' Compensation Court, WCC No. 2010-2503
                  Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Patrick R. Sheehy, Halverson, Sheehy & Plath, P.C., Billings, Montana

        For Appellee:

        Kelly M. Wills, Jeffrey B. Smith, Garlington, Lohn & Robinson, PLLP,
        Missoula, Montana

Submitted on Briefs:  April 11, 2012

Decided:  July 24, 2012

Filed:

_____
                         Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Richard Ford suffered a work-related injury to his neck. He was diagnosed with a cervical strain, and Sentry Casualty Company accepted liability and paid benefits for this injury. During Ford's treatment, he underwent an MRI which revealed a more serious cervical disc condition. Ford claimed that the workplace accident caused or aggravated this condition and that Sentry was liable for surgery to address it. Ford also claimed that Sentry was liable for ongoing temporary total disability benefits and that Sentry had unreasonably adjusted his claim.

¶2 Sentry denied liability for Ford's cervical disc condition based on the opinions of several doctors that the condition was not related to the industrial accident. Sentry also maintained that Ford has reached maximum medical improvement, that he has been released to return to work without restrictions, and that it reasonably adjusted his claim. The dispute ultimately reached the Workers' Compensation Court (WCC). Trial was held January 28, 2011. Ford and his wife testified, and numerous medical records were admitted into evidence. The WCC ruled in favor of Sentry as to each of the foregoing issues, and Ford now appeals.

¶3 The issues and sub-issues raised on appeal are as follows:

1. Whether the WCC erred in determining that Sentry is not liable for medical bills and treatment involving Ford's cervical disc condition.

   A. Whether the WCC applied an incorrect standard of proof on the question of causation.

   B. Whether the WCC erred in relying solely on medical opinions to determine causation and aggravation.

C. Whether the WCC erred in concluding that Ford had not adequately demonstrated that the industrial accident caused or aggravated his cervical disc condition.

2. Whether the WCC erred in determining that Sentry is not liable for ongoing temporary total disability benefits.

3. Whether the WCC erred in determining that Sentry is not liable for costs, attorney's fees, or a penalty.

We affirm as to all three issues. In so doing, we clarify the standards and analysis for determining a casual connection between a claimed injury and a workplace accident.

**BACKGROUND**

**Circumstances of Ford's Injury**

¶4    At the time of the accident, Ford was 38 years old and employed as a yard worker with Pacific Hide and Fur in Billings. Pacific Hide and Fur was enrolled under Compensation Plan No. 2 of the Workers' Compensation Act and insured by Sentry. On September 29, 2009, Ford was working when the baler jammed. This machine takes scraps of metal, which enter on a conveyor belt, and compresses them into a solid bale of metal similar to a bale of hay. Ford and his coworkers were unable to dislodge the jammed metal using a cutting torch, so they attempted to pull the metal out of the baler using a Ford Ranger pickup truck and a tow chain. They attached one end of the chain to the metal and the other end to the tow hook on the front of the pickup. Ford got into the pickup, put it in reverse, gave it gas, and popped the clutch. The jammed metal did not budge. As a result, when the tow chain became taut, the pickup came to an abrupt stop, actually coming off the ground, and Ford's head "snapped back" with such force that his hardhat flew into the back of the crew cab pickup. Ford attempted this maneuver at least

3

two more times, with the same results. Eventually, he and his coworkers dislodged the metal using a Volvo loader.

¶5 On the way home after his shift, Ford felt an ache in the back of his neck down into his shoulders and felt stiff and sore. He felt the same way the next morning and also had a headache. Although he had experienced occasional headaches in the past, Ford did not have neck problems and had never sought medical treatment for headaches or neck pain prior to this incident. Ford advised his supervisor of his condition and sought medical care at a clinic in Billings.

¶6 Over the ensuing months, Ford was seen by a slew of different doctors due to ongoing complaints of headaches, neck pain, and numbness and tingling in his fingers. After learning the results of his MRI, and based on discussions with one of his doctors, Ford concluded that he should undergo surgery to address his cervical disc condition. The question then arose as to whether this condition was causally related to the accident of September 29. Ford's doctors were not in unanimous agreement on this point, and it therefore became necessary for the WCC, and now this Court, to review the various medical opinions, and the bases therefor, in some detail.

**Medical Evaluations and Opinions**

¶7 Ford was first seen by Adam Mattingly, a physician assistant at the Billings clinic, on September 30, 2009. Mattingly diagnosed Ford has having suffered a cervical strain. He recommended physical therapy and certain restrictions on Ford's physical activities. Ford did not find the physical therapy beneficial, however, and continued to complain of neck pain and intermittent numbness and tingling in his fingers.

4

¶8     Ford underwent a cervical MRI on October 20.  The MRI revealed degenerative changes in Ford's cervical spine, most significantly at the C5-6 and C6-7 levels.  There was disc desiccation, disc space narrowing, posterior bony ridging and disc bulge, and a foraminal disc herniation which compromised the right neural foramen.

¶9     Mattingly referred Ford to a neurosurgeon, Eric Schubert, M.D., who saw Ford on three occasions in November and December 2009.  Based on Ford's medical history, the MRI results, and a neurological examination, Dr. Schubert opined that the degenerative changes shown on Ford's MRI "were certainly present" *before* the work-related accident, with the possible exception of a disc protrusion or herniation at the C5-6 level which Dr. Schubert stated "may have occurred" at the time of the accident.  Dr. Schubert theorized that Ford had an underlying asymptomatic degenerative lesion which "could have become" symptomatic as a result of the accident.  He noted, however, that Ford's cervical condition did not fit with his complaints of numbness and tingling in his fingers, i.e., there was "some mismatch of his radicular symptoms with the cervical pathology."

¶10     Dr. Schubert opined that surgery may have "some role" in Ford's treatment, but he advised Ford that he wanted to exhaust nonsurgical treatment options first.  Dr. Schubert recommended a cervical epidural steroid injection.  When this did not provide relief, he ordered a second epidural steroid injection and recommended that Ford undergo bilateral electromyography and nerve conduction velocity (EMG/NCV) studies of the upper extremities.  Ford underwent the EMG/NCV studies on December 4.  The studies did not reveal any evidence of radiculopathy (i.e., disease of the spinal nerve roots from inflammation or impingement) or other neuropathies in either arm.

¶11    Dr. Schubert reevaluated Ford on December 23.  Based on Ford's report that his symptoms still persisted, and given the fairly significant findings on the MRI, Dr. Schubert concluded that "the better part of valor is to offer surgery and, if [Ford] wishes, to proceed with surgical treatment" (specifically, a two-level anterior cervical discectomy and fusion at C5-6 and C6-7).  Dr. Schubert noted that he had reviewed the MRI images with another neurosurgeon who agreed that Ford's cervical pathology "should be fixed."  Dr. Schubert advised Ford, however, that the potential benefit of surgery was about a 50 percent chance of significant improvement in his neck pain and no likely change in his hand symptoms.

¶12    Meanwhile, at Mattingly's request, Ford was evaluated by Scott Ross, M.D., an occupational medicine specialist, who became Ford's treating physician and continued to evaluate Ford on roughly a monthly basis.  At their first visit, on December 4, Dr. Ross thoroughly reviewed Ford's available medical records, questioned Ford about his current status, and conducted a physical examination.  Dr. Ross noted that Ford was continuing to report pain in the posterior neck region, but there was "no point localization or point specificity" to the complaints.  Nor was there any "consistent pattern or periodicity" to the complaints; rather, "they vary from day to day per his report."  Dr. Ross inspected the posterior region of Ford's neck and found no redness, puffiness, swelling, discoloration, edema, or bony step-off in the midline.  When Dr. Ross made light touch palpations in the neck region, Ford gave "exaggerated/embellished" pain responses (in Dr. Ross's opinion).  As for Ford's appearance and mobility, Dr. Ross observed that

Mr. Ford is seated comfortably in the exam chair during today's lengthy interview. He does not shift about uncomfortably, nor does he appear uncomfortable. Throughout the interview, he is freely and fully moving his head and neck. He is able to easily rotate and extend his neck when looking up at the "Pain Chart" mounted on the exam room cupboard, performing this task without limitation or pain complaint. He stands without assistance, difficulty, or pain complaint. He is able to dress/undress without assistance or difficulty. He moves about during today's examination without difficulty or pain. He doffed his long sleeved T-shirt without difficulty, using both upper extremities – no pain complaints. At the conclusion of today's physical examination, he donned his long sleeved T-shirt without difficulty, and donned his jacket without difficulty, utilizing both upper extremities. He also donned his knitted cap at the end of today's physical exam, utilizing both upper extremities to position the cap, performing this task without difficulty.

¶13    Dr. Ross found no "objective correlation" between his physical examination of Ford and Ford's subjective complaints of neck pain. Likewise, Dr. Ross noted that Ford's complaints of numbness and tingling in his fingers were not consistent with the EMG/NCV studies, which had revealed no electrodiagnostic abnormality. Dr. Ross assessed Ford has having a cervical strain and recommended that Ford undergo a psychological evaluation. Dr. Schubert concurred in this recommendation. As to Ford's request for pain medication, Dr. Ross noted that Ford had been prescribed "significant quantities" of narcotic pain medication since October and that Dr. Schubert had recently prescribed a one-month supply. Dr. Ross thus denied Ford's request.

¶14    Joseph McElhinny, Psy.D., conducted the psychological evaluation of Ford on December 30 and then issued a report based on his review of Ford's post-injury medical records, his clinical interview with Ford, a Personality Assessment Inventory, and a Survey of Pain Attitudes. Dr. McElhinny concluded that Ford has a somatoform pain disorder that is being fueled by depression. Dr. McElhinny observed that Ford seemed

unhappy, had very low self-insight into his own affective functioning, and focused on external causes for his unhappiness. Dr. McElhinny opined that Ford exhibits physical symptomatology, like high levels of pain, in lieu of emotional distress. Dr. McElhinny also posited that Ford's response to pain-producing stimuli is exaggerated because of Ford's prior methamphetamine use.[1] Dr. McElhinny observed that "Mr. Ford has a number of antisocial personality features which come into play when he is seeking medical care and treatment. He is prone to manipulative behaviors (almost automatically)." Dr. McElhinny thus cautioned medical care providers to "use only objective medical evidence when prescribing treatments for this man."

¶15 In a letter to Sentry that is undated but appears to have been written following the psychological evaluation, Dr. Schubert reiterated his opinion that Ford has a cervical condition which "may very well be" the cause of his neck pain and which warrants surgical treatment. Although Ford's subjective complaints of pain did not correlate with objective medical findings on physical examination, Dr. Schubert noted that "many surgical candidates with significant axial skeletal pain with significant degenerative pathology unresponsive to medical or non-operative therapy do not have objective findings on examination and very often do well with surgery in terms of symptom relief." Dr. Schubert recommended that Ford be referred for a second neurosurgical opinion.

¶16 Steven Speth, M.D., an orthopedic spine surgeon, evaluated Ford on March 11, 2010. He diagnosed Ford with cervical spondylosis (i.e., degenerative disc disease

---

[1] Ford admitted at trial in the WCC that he had been addicted to methamphetamine in the past. Ford testified that he completed treatment for his addiction and had not used methamphetamine since 2003.

resulting in compression of the nerve roots), and congenital and acquired stenosis (abnormal narrowing of the open spaces within the spine) at C5-6. He found "objective evidence for surgery in that there is significant cord flattening and some subtle signal change within the cord." He thus recommended that Ford proceed with Dr. Schubert's proposed treatment. Dr. Speth provided "no opinion regarding causation," however.

¶17 Dr. Ross reevaluated Ford in January, March, and April 2010. His assessments at these evaluations were more or less the same as his original December 4 assessment: Ford made subjective complaints of diffuse and generalized posterior neck pain and headaches, but Dr. Ross found no objective correlation on physical examination. Notably, Dr. Ross twice recorded "an examination inconsistency." Specifically, Ford reported pain to *light* touch palpation over the posterior spinous processes in the cervical midline; however, "when distracted," *firm* palpation pressure in this same region elicited no pain response whatsoever. At the January 11 evaluation, Dr. Ross noted that "throughout today's interview, Mr. Ford is freely, fluidly, and fully moving his cervical spine, including flexion, extension, lateral bending, and rotation; in fact, he exhibits excellent range of motion of the cervical spine." Likewise, at the March 16 evaluation, Dr. Ross noted that Ford was seated comfortably in the exam chair during the interview, was "cheerful, smiling, and joking throughout today's evaluation," and was moving his head and neck "freely and fully . . . without limitation, restriction, or pain complaint." Dr. Ross made similar observations at the April 12 evaluation.

¶18 Dr. Ross's last evaluation of Ford occurred May 17, 2010. Ford reported a reduction in the frequency and intensity of his headaches. He also reported that his neck

pain was minimal in intensity, describing it as "just annoying," without radicular-type symptoms into either upper extremity. Ford had been walking approximately one mile per day and was able to lift his three-year-old son, who weighed approximately 40 pounds. Dr. Ross observed Ford moving his head, neck, and both upper extremities fully and freely, without limitation, restriction, or pain complaint. Ford reported no pain to palpation over the posterior spinous processes in the cervical midline.

¶19 Based on this evaluation, Dr. Ross concluded that Ford had reached "maximum medical improvement" from the September 29 work incident. Dr. Ross opined "[o]n a medically more probable than not basis" that the accident had caused "a temporary aggravation" of Ford's preexisting cervical spine condition and that Ford had now returned to his "baseline status." Dr. Ross thus released Ford "to regular and unrestricted work duties," noting there were "no permanent limitations or restrictions" attributable to the work incident. As for the proposed surgery, Dr. Ross stated "[o]n a medically more probable than not basis" that Ford's need for a two-level anterior cervical discectomy and fusion "is not causally related to/attributable to" the work incident. Rather, in Dr. Ross's opinion, "[a]ny surgery contemplated at this time is attributable to the preexisting cervical spondylosis and congenital/acquired spinal stenosis."

¶20 Henry Gary, M.D., a neurosurgeon, conducted an independent medical examination of Ford on July 20. He reviewed the available medical records, including Ford's MRI, took Ford's history, and performed a physical examination. Ford reported neck pain and numbness in certain fingers. He also complained of daily headaches, which were "on and off all day long" but lessened somewhat with the use of Percocet.

10

Ford reported that he had recently developed a new type of headache, which Dr. Gary thought might be migrainous. Dr. Gary opined that this type of headache could be related to Ford's ongoing use of narcotic medication.

¶21 Dr. Gary diagnosed Ford with chronic cervical strain. In Dr. Gary's opinion, "on a more probable than not basis," Ford's cervical disc condition "preceded" the industrial injury and was "not caused by the injury." He noted that there is a "possibility" that some disc herniation "could have occurred" with the accident, but he stated that it is "impossible" to determine whether or not it did due to the absence of a pre-injury MRI. Dr. Gary agreed with Drs. Schubert and Speth that Ford needs surgery to address his underlying degenerative disc disease. Dr. Gary also agreed with the procedure recommended by Dr. Schubert. Importantly, however, Dr. Gary stated that in his opinion "surgery is necessary because of the radiographic findings and not because of the symptoms that [Ford] is complaining of." In his opinion, Ford's present pain "is related to the cervical strain injury" rather than "the underlying degenerative disc disease, which is a separate issue." In this regard, Dr. Gary noted that Ford's complaints of neck pain, headaches, and episodic numbness and tingling in certain fingers do "not correlate well" with the MRI findings, but are "consistent with" a cervical strain injury. Dr. Gary was "not optimistic," therefore, that surgery would significantly alter Ford's symptoms.

¶22 Upon receipt of Dr. Gary's report, Sentry desired to obtain "a consensus opinion" as to whether Ford's need for cervical spine surgery is causally related to the accident. Responding to Sentry's inquiry, Dr. Ross indicated that he would defer to the spine surgeons (Drs. Schubert, Speth, and Gary) regarding *the necessity* for surgery. But as to

11

*the underlying cause*, Dr. Ross stated that he agreed with Dr. Gary: on a medically more probable than not basis, any contemplated surgery is "attributable to the preexisting and radiographically confirmed cervical spondylosis, degenerative disk disease, and congenital/acquired spinal stenosis, and not attributable to the 09/29/09 cervical strain."

¶23 Dr. Schubert also responded to Sentry's inquiry. In his opinion, Ford had suffered "cervical strain from essentially a 'whiplash' mechanism of injury." Dr. Schubert noted that Ford's MRI findings were consistent with "typical degenerative changes" and "most likely predated his injury." He stated that Ford "could have" become symptomatic from a preexisting degenerative problem, but he classified this as "a medical possibility and not as a medical probability." Dr. Schubert suggested that the contemplated surgery would not necessarily resolve Ford's headaches and neck pain:

> While I believe that surgery is effective in some cases of neck pain refractory to non-operative treatments and without radicular symptoms but with significant degenerative changes, I think that it's [sic] success rate for significant improvement is in the 50% range at best and this without confounding factors. I think that sometimes headaches from muscle spasm compensatory or secondary to degenerative spine conditions can sometimes improve[;] however . . . *if this occurs this is an extra "bonus" of the procedure*, but not something that can be expected as headaches have so many other causes other th[a]n cervical muscle spasm. I think in the majority of cases, headaches associated with neck pain do not respond to surgical treatment. . . . Surgery for essentially axial neck pain in the face of degenerative changes is at best a 50/50 chance of improvement in symptoms without confounding factors. [Emphasis added.]

Dr. Schubert concluded: "[G]iven that Mr. Ford does have confounding issues and particularly in light of his neuropsychological evaluation by Dr. McElhinny, I think he would be a very poor candidate for surgery and would [be] very unlikely to have significant relief of his symptoms."

12

¶24 The last doctor to provide an opinion on Ford's condition is John Moseley, M.D., MS, PC. Dr. Moseley, a neurosurgeon, conducted an independent medical examination of Ford on September 23, 2010. He diagnosed Ford with cervical radiculopathy (i.e., irritation of a cervical nerve root due to a cervical disc herniation) and posttraumatic headache. He opined, "within a reasonable degree of medical probability," that the work incident aggravated Ford's preexisting cervical spine condition by causing the discs at the C5-6 and C6-7 levels to bulge significantly enough to compress and impinge his spinal cord. Dr. Moseley detailed his reasoning as follows:

> The objective medical evidence which supports this finding is the fact that Mr. Ford has never had cervical spine symptoms or cervical radiculopathy before this injury occurred. He denies having any symptoms at all before this injury. There are no medical records of any cervical spine complaints before the 09/29/09 injury. I performed many operations on cervical conditions very similar to Mr. Ford's condition over the course of my career as a neurosurgeon. In my experience, patient's [sic] with Mr. Ford's degree of cervical radiculopathy involvement as shown on the 10/20/09 MRI seek medical treatment urgently. The fact that Mr. Ford immediately sought medical treatment one day after his injury and that his cervical radiculopathy symptoms have continued more or less in the same timeframe, leads me to conclude within a reasonability [sic] degree of medical probability that his injury produced a material and substantiation [sic] aggravation of his cervical disk disease, i.e., bulging disk significant to cause symptoms. Other factors which influence my opinion are the nature of the injury itself. Rapid hyperextension and flexion of the cervical spine is one of the most common methods of causing or substantially aggravating disks in the cervical spine. His description of his injury and onset of symptoms is common, in my experience.

¶25 Dr. Gary reviewed Dr. Moseley's assessment. In a December 22, 2010 letter to Sentry, he stated that he disagreed with the diagnosis of cervical radiculopathy. Dr. Gary pointed out that Ford had not described "a true radiculopathy, as he has no radiating pain from the neck out the arms." Dr. Gary noted that he had found no objective findings of

13

radiculopathy in his evaluation of Ford and that neither Dr. Schubert nor Dr. Ross had described a radiculopathy or a radiculitis in their medical reports. Dr. Gary was thus "at a loss as to why Dr. Moseley would classify this as a radiculopathy with discrepancy in the sensory findings." In any event, Dr. Gary concluded that if Ford had in fact developed symptoms of radiculopathy, it was unrelated to the workplace injury and more likely related to progressive cervical spondylitic changes.

¶26 Ford testified at trial that his ongoing physical complaints since the accident are daily headaches, stiffness and soreness in his neck, and numbness and tingling in some of his fingers. He stated that his pain medications lessen his symptoms but that his pain has never entirely resolved. Ford testified that he wants surgery on his neck and understands that doctors have predicted a 50 percent chance that the procedure will improve his neck pain and headaches. He stated that he does not believe he can work presently because he does not believe he could find a job that would allow him to take frequent breaks and lie down as much as is necessary. Ford currently receives unemployment benefits and has conducted job searches as required to maintain those benefits.

**The WCC's Decision**

¶27 On the question whether Sentry is liable for medical bills and treatment involving Ford's cervical disc condition, the WCC noted that the parties' dispute centered on whether the industrial accident had caused or aggravated the condition. In this regard, the WCC observed that Dr. Moseley had opined Ford's cervical disc herniation occurred in the accident, while Drs. Schubert and Gary thought this was possible but could not say with a reasonable degree of medical certainty that the accident had caused the herniation.

14

As to which of these opinions it would give more weight, the WCC noted that the opinion of a treating physician is generally accorded greater weight than the opinions of other expert witnesses, although it is not conclusive. *See EBI/Orion Group v. Blythe*, 1998 MT 90, ¶¶ 12-13, 288 Mont. 356, 957 P.2d 1134. Here, Dr. Schubert treated Ford for his cervical condition following the accident, whereas Drs. Gary and Moseley saw Ford for independent medical examinations. The WCC also noted that it considers such factors as the relative credentials of the physicians and the quality of evidence upon which the physicians based their respective opinions. Here, the court observed, no evidence was presented giving it grounds to assign greater weight to Dr. Moseley's opinion than to Dr. Schubert's opinion. Thus, the WCC ruled that "[s]ince Dr. Schubert was unable to state with a reasonable degree of medical certainty that Ford's industrial accident caused his cervical disk condition, I conclude that Ford has not proven that his industrial accident caused his cervical disk condition."

¶28 As to the issue of aggravation, the WCC distinguished *Narum v. Liberty N.W. Ins. Corp.*, 2009 MT 127, 350 Mont. 252, 206 P.3d 964, where this Court concluded that Narum had met his statutory burden to show that his industrial accident aggravated his preexisting degenerative hip condition, thus requiring hip surgery and other treatments. *Narum*, ¶¶ 26-31. The WCC noted that in *Narum*, the claimant's subjective complaints of pain correlated with objective medical findings regarding his hip condition, whereas Ford's subjective complaints of pain do not correlate with the objective medical findings regarding his cervical disc condition. The WCC reasoned that "[a]lthough Ford clearly has ongoing problems from the industrial injury, the medical opinions in evidence

15

indicate that the problems from the industrial injury would not be addressed by the proposed surgery Ford seeks." Based on the medical evidence, the WCC concluded "that Ford had an asymptomatic cervical disk condition before his industrial injury and continues to have an asymptomatic cervical disk condition after his industrial injury."

¶29 The WCC next considered whether Sentry is liable for temporary total disability benefits subsequent to Dr. Ross's May 17, 2010 determination that Ford has reached maximum medical improvement. In this regard, the WCC noted that some of Ford's doctors have recommended additional treatment for his symptoms of headaches, neck pain, and tingling in his fingers which the court noted "are indisputably related to his industrial injury." The WCC reasoned that it is impossible for an injured worker to be simultaneously at maximum medical improvement while still expected to improve with further treatment. Nevertheless, the WCC observed that if an injured worker has been released to return to his time-of-injury employment, then he is not eligible for temporary total disability benefits. Thus, since no doctor had disputed Dr. Ross's opinion that Ford can return to work without restriction, the WCC held that Ford is not entitled to temporary total disability benefits.

¶30 Lastly, the WCC concluded that since Ford was not the prevailing party, he was not entitled to costs, attorney's fees, or a penalty under §§ 39-71-611 and -2907, MCA.

**STANDARDS OF REVIEW**

¶31 We review the WCC's conclusions of law de novo to determine whether they are correct. *Narum*, ¶ 25. We review the WCC's findings of fact to determine whether they are supported by substantial credible evidence. *Narum*, ¶ 25. In reviewing the WCC's

16

factual findings, we defer to the WCC's judgment regarding the credibility of witnesses who testify in person at trial and the weight to be accorded their testimony. *Harrison v. Liberty N.W. Ins. Corp.*, 2008 MT 102, ¶ 12, 342 Mont. 326, 181 P.3d 590. This is because an assessment of testimony is best made upon observation of the witness's demeanor and consideration of other intangibles that are only evident during live testimony. *Harrison*, ¶ 12. Conversely, we are in as good a position as the WCC to assess testimony presented by way of deposition, and we thus conduct de novo review of deposition testimony. *Harrison*, ¶ 13. The same principle would apply to the assessment of medical opinions provided through written reports, and our review of such medical opinions is thus de novo. If there is conflicting evidence, we consider whether substantial evidence supports the WCC's findings, not whether the evidence might support contrary findings. *Keller v. Liberty N.W., Inc.*, 2010 MT 279, ¶ 21, 358 Mont. 448, 246 P.3d 434.

## DISCUSSION

¶32 The WCC stated that the 2009 version of the Workers Compensation Act (Title 39, chapter 71, MCA) governs this case. This is incorrect. The statutes in effect on the date of the accident or injury control in workers' compensation cases. *Fleming v. Intl. Paper Co.*, 2008 MT 327, ¶ 26, 346 Mont. 141, 194 P.3d 77. Ford's accident occurred on September 29, 2009. With exceptions not applicable here, "every statute . . . takes effect on the first day of October following its passage and approval." Section 1-2-201(1)(a), MCA. Thus, laws enacted by the 2009 Legislature did not take effect until two days after Ford's accident (again, with exceptions not applicable here, *see* § 1-2-201, MCA). It follows, then, that the 2007 version of the Act governs Ford's claim, and all statutory

17

references below are to the 2007 MCA unless otherwise indicated. Although the WCC misstated the governing version of the Act, we conclude that the court ultimately reached the correct resolution of this case in any event.

¶33 ***Issue 1. Whether the WCC erred in determining that Sentry is not liable for medical bills and treatment involving Ford's cervical disc condition.***

¶34 Ford, as claimant, bears the burden of proving by a preponderance of the evidence that he is entitled to the workers' compensation benefits sought. *Simms v. State Compen. Ins. Fund*, 2005 MT 175, ¶ 13, 327 Mont. 511, 116 P.3d 773. This includes establishing a "causal connection" between his injury and the right to benefits. *Fellenberg v. Transp. Ins. Co.*, 2005 MT 90, ¶ 16, 326 Mont. 467, 110 P.3d 464; *Narum*, ¶ 28. " 'Causation is an essential element to an entitlement to benefits and the claimant has the burden of proving a causal connection by a preponderance of the evidence.' " *Fellenberg*, ¶ 16 (quoting *Grenz v. Fire & Cas. of Conn.*, 250 Mont. 373, 380, 820 P.2d 742, 746 (1991)).

¶35 Ford raises three distinct sub-issues concerning the WCC's causation analysis and asks that we clarify the law in this area. The first pertains to the standard of proof; the second concerns the WCC's reliance solely on medical opinions; and the third involves the WCC's interpretation of the evidence. We address these issues in turn.

### A. Standard of Proof

¶36 An insurer is liable for the payment of compensation to an employee who receives "an injury arising out of and in the course of employment." Section 39-71-407(1), MCA. The claimant must establish that it is "more probable than not" that (i) a claimed injury has occurred or (ii) a claimed injury aggravated a preexisting condition. Section

18

39-71-407(2)(a), MCA. Proof that it was "medically possible" that a claimed injury occurred, or that the claimed injury aggravated a preexisting condition, is not sufficient to establish liability. Section 39-71-407(2)(b), MCA.

¶37 Section 39-71-119, MCA, provides the controlling definitions with regard to the injury itself and the requisite causal connection. *Burns v. Plum Creek Timber Co.*, 268 Mont. 82, 84, 885 P.2d 508, 509 (1994); § 39-71-407(2)(a), MCA ("An insurer is liable for an injury, *as defined in 39-71-119, . . . .*" (emphasis added)). An "injury" may take the form of internal or external physical harm to the body, damage to prosthetic devices or appliances, or death. Section 39-71-119(1), MCA. By definition, an "injury" is "caused by" an "accident," i.e., by "an unexpected traumatic incident or unusual strain; identifiable by time and place of occurrence; identifiable by member or part of the body affected; and caused by a specific event on a single day or during a single work shift." Section 39-71-119(2), MCA. Thus, to be compensable, "there must be an 'injury' and an 'accident,' and the injury must be 'caused by' the accident." *Welch v. Am. Mine Servs.*, 253 Mont. 76, 81, 831 P.2d 580, 584 (1992).

¶38 We read §§ 39-71-407 and -119, MCA, together, not only because the former expressly references the latter, but also because " 'when interpreting statutes we view them as part of a whole statutory scheme, and construe them so as to forward the purpose of that scheme.' " *Tinker v. Mont. State Fund*, 2009 MT 218, ¶ 30, 351 Mont. 305, 211 P.3d 194 (quoting *Vader v. Fleetwood Enters.*, 2009 MT 6, ¶ 30, 348 Mont. 344, 201 P.3d 139). Doing so, the statutory standard is clear: the claimant's burden to establish an accident, an injury or aggravation of a preexisting condition, and a causal connection

between the accident and the injury/aggravation is "more probable than not." *Prillaman v. Community Med. Ctr.*, 264 Mont. 134, 137, 870 P.2d 82, 84 (1994) ("[B]y reference [to § 39-71-119, MCA], § 39-71-407, MCA, dictates that 'accident,' 'injury' and 'causation' must be proven by the claimant with the 'more probable than not' burden of proof.").

¶39    Ford contends that the WCC failed to apply this standard in his case. The WCC began its analysis with a statement of the statutory standard:  "an insurer is liable for an injury . . . if the claimant establishes that it is more probable than not that the claimed injury either occurred or aggravated a preexisting condition" (citing § 39-71-407(2), MCA). The WCC then proceeded, however, to use the term "reasonable degree of medical certainty" in its analysis and ultimately held that "[s]ince Dr. Schubert was unable to state *with a reasonable degree of medical certainty* that Ford's industrial accident caused his cervical disk condition, I conclude that Ford has not proven that his industrial accident caused his cervical disk condition" (emphasis added). Ford argues that the WCC erred in holding him to this "medical certainty" standard.

¶40    Sentry, on the other hand, argues that the WCC did not hold Ford to the wrong standard. Sentry points out that the WCC relied on the reports of Ford's physicians, all of whom expressed their opinions in terms of medical "probability." At one point in his report, Dr. Gary also used the term "reasonable medical certainty"; however, this was in his answer to a question posed by Sentry, where Sentry asked Dr. Gary to "please state your opinion to a reasonable degree of medical certainty, i.e., medically more probable than not." Sentry opines that the WCC likewise used the terms "medical certainty" and "medical probability" synonymously. Sentry contends that this Court and the WCC have

20

used these terms interchangeably in prior cases, citing *Rightnour v. Kare-Mor, Inc.*, 225 Mont. 187, 732 P.2d 829 (1987), *Gallagher v. The Wally's Bar*, No. 8405-2458 (Mont. WCC Mar. 8, 1985), and *Strong v. Jacobs Constructors*, No. 8502-2895 (Mont. WCC June 19, 1985), as examples. We note that the pertinent portions of the WCC's orders in *Gallagher* and *Strong*—which Sentry quotes in its brief—are actually quotations from our decision in *Dallas v. Burlington N., Inc.*, 212 Mont. 514, 689 P.2d 273 (1984).

¶41　Implicit in Ford's and Sentry's arguments is a dispute about whether "reasonable degree of medical certainty" and "more probable than not" are qualitatively different. Ford's position is that the former is a "higher standard" than the latter, while Sentry maintains that the two terms are synonymous. We conclude, however, that we need not attempt to parse these terms in resolving the standard of proof issue. In *Dallas*, we observed that this Court has generally adhered to a test of "reasonable medical certainty" as the basis for admitting medical testimony. 212 Mont. at 522, 689 P.2d at 277. We recognized, however, that this term "is not well understood by the medical profession" because "[l]ittle, if anything, is 'certain' in science." *Dallas*, 212 Mont. at 522-23, 689 P.2d at 277. We explained that what we are striving for "is a probability rather than a possibility" and, thus, that "[o]ur evidentiary standards are satisfied if medical testimony is based upon an opinion that it is 'more likely than not.' " *Dallas*, 212 Mont. at 523, 689 P.2d at 277. Since then, we have adhered to the proposition that "a medical expert's opinion is admissible if it is based on an opinion that it is 'more likely than not.' " *Butler v. Domin*, 2000 MT 312, ¶ 13, 302 Mont. 452, 15 P.3d 1189 (quoting *Dallas*, 212 Mont. at 523, 689 P.2d at 277); *accord State v. Vernes*, 2006 MT 32, ¶ 15, 331 Mont. 129, 130

P.3d 169; *Estate of Willson v. Addison*, 2011 MT 179, ¶ 18, 361 Mont. 269, 258 P.3d 410. The "more likely than not" standard assures that the expert testimony or opinion "does not represent mere conjecture, but rather is sufficiently probative to be reliable." *Vernes*, ¶ 18 (citing *Dallas*, 212 Mont. at 523, 689 P.2d at 277).

¶42 Subsequent to *Dallas*, the Legislature incorporated a "more probable than not" standard into § 39-71-407, MCA, as the burden which a claimant must satisfy in demonstrating accident, injury, and causation. Laws of Montana, 1987, ch. 464, § 11. Of course, notwithstanding the particular language used in the statute, we cannot control how doctors phrase their opinions and testimony on these issues, and we do not purport to do so here. As a result, there may be cases in which a doctor states his or her opinion in terms of "a reasonable degree of medical certainty" or fails to state that his or her opinion is on a "more probable than not" basis. Nevertheless, the probative force of the opinion "is not to be defeated by semantics if it is reasonably apparent that the doctor intends to signify a probability supported by some rational basis." *Miller v. Natl. Cabinet Co.*, 168 N.E.2d 811, 813 (N.Y. 1960); *see also Ins. Co. of N. Am. v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966) ("Reasonable probability . . . is determinable by consideration of the substance of the testimony of the expert witness and does not turn on semantics or on the use by the witness of any particular term or phrase."). Doctors are not lawyers and may on occasion phrase medical opinions in medical, rather than legal, terminology.

¶43 What is essential is that *the WCC* applies the correct standard in determining whether there was an accident in the course of employment, whether the claimant suffered an injury or an aggravation of a preexisting condition, and whether there is a

22

causal connection between the accident and the injury/aggravation. That standard is "more probable than not." Here, it is apparent that the WCC recognized the correct statutory standard at the outset of its analysis. Regardless of whether the WCC intended its subsequent references to "reasonable degree of medical certainty" to mean something different, we conclude for the reasons discussed below that the WCC ultimately reached the correct result when the "more probable than not" standard is applied to the medical evidence at issue. Nevertheless, we note for purposes of future cases that it will facilitate this Court's review on appeal if the WCC frames its analysis in terms of the statutory "more probable than not" standard of proof.

## B. Objective Medical Findings

¶44 Ford next contends that the WCC erred in relying solely on medical opinions to determine causation or aggravation. Ford recognizes that an injury must be established "by objective medical findings." Section 39-71-407(2)(a), MCA. As noted, "injury" includes internal physical harm to the body, § 39-71-119(1)(a), MCA, and Ford contends that there is overwhelming objective medical evidence that he has internal physical harm to his body, namely, a cervical disc condition. Ford then asserts that once a claimant has provided objective medical findings of internal harm to the body, all the claimant must establish under § 39-71-407(2)(a)(ii), MCA, is that it is more probable than not that his injury aggravated his preexisting condition. Ford maintains that the evidence bearing on this question need not be limited to medical opinions. He quotes our statement in *Boyd v. Zurich Am. Ins. Co.*, 2010 MT 52, ¶ 22, 355 Mont. 336, 227 P.3d 1026, that "claimants are not required to prove causation through medical expertise or opinion." For the

reasons which follow, however, we conclude that this statement in *Boyd* is an incorrect statement of the law and must accordingly be overruled. Pursuant to workers' compensation laws in effect since July 1, 1995, a claimant is required to establish injury and causation through objective medical findings.

¶45 As authority for the proposition that "claimants are not required to prove causation through medical expertise or opinion," the Court in *Boyd* cited *Plainbull v. Transamerica Ins. Co.*, 264 Mont. 120, 870 P.2d 76 (1994), and *Prillaman*, 264 Mont. 134, 870 P.2d 82. *Plainbull* involved the 1989 version of § 39-71-407(2), MCA, which states:

> (a) An insurer is liable for an injury as defined in 39-71-119 if the claimant establishes it is more probable than not that:
> (i) a claimed injury has occurred; or
> (ii) a claimed injury aggravated a preexisting condition.
> (b) Proof that it was medically possible that a claimed injury occurred or that such claimed injury aggravated a preexisting condition is not sufficient to establish liability.

Interpreting this language, the WCC held that medical testimony is required to establish the requisite causal connection, i.e., that it is "*medically* more probable than not" that a work-related accident caused the condition at issue. *Plainbull*, 264 Mont. at 125, 870 P.2d at 80 (emphasis added, internal quotation marks omitted). This Court, however, held that nothing in § 39-71-407(2)(a), MCA (1989), requires a medical opinion as to whether the injury actually occurred and whether it was caused by the accident. *Plainbull*, 264 Mont. at 125, 870 P.2d at 79-80.

> Under our present statutory scheme, all that the legislature has required of a claimant is that he establish that it is "more probable than not" that his injury or aggravation of a preexisting condition occur[red] out of and in the course of his employment and . . . that the injury cause[d] the condition for which he is seeking workers' compensation benefits. Whether the claimant

24

> chooses to meet that burden with medical evidence, non-medical evidence or a combination of both, is up to him and, obviously, depends on the facts and circumstances of his particular case, the nature of the claimed injury, and the evidence available.

*Plainbull*, 264 Mont. at 126, 870 P.2d at 80.

¶46 *Prillaman* involved the same question: whether the WCC erred in concluding that medical opinion evidence was required to establish injury and causation. 264 Mont. at 135, 870 P.2d at 83. Interpreting the 1991 version of § 39-71-407(2), MCA, which is identical to the 1989 version, we concluded that a claimant is not required to prove occurrence under § 39-71-407(2), MCA, and, by reference, causation under § 39-71-119, MCA, by use of medical opinion evidence. *Prillaman*, 264 Mont. at 137, 870 P.2d at 84. Since the WCC had considered only the doctors' medical opinions as to these issues, we reversed and remanded with instructions to "consider and weigh all testimony, whether 'medical opinion evidence' or not." *Prillaman*, 264 Mont. at 139-40, 870 P.2d at 85.

¶47 Subsequent to these decisions, the Legislature amended § 39-71-407, MCA, and thereby abrogated *Plainbull* and *Prillaman*, by inserting the following italicized language into subsection (2)(a): "An insurer is liable for an injury, as defined in 39-71-119, *if the injury is established by objective medical findings and* if the claimant establishes that it is more probable than not that: (i) a claimed injury has occurred; or (ii) a claimed injury aggravated a preexisting condition." Laws of Montana, 1995, ch. 243, § 8 (italics in original).[2] The Legislature also added a new subsection which states: "An employee is not eligible for benefits payable under this chapter unless the entitlement to benefits is

---

[2] Subsection (2)(a) remained unchanged until 2011, when additional language was inserted and it was renumbered (3)(a). *See* Laws of Montana, 2011, ch. 167, § 8.

established by objective medical findings that contain sufficient factual and historical information concerning the relationship of the worker's condition to the original injury." Laws of Montana, 1995, ch. 243, § 8 (italics omitted), *formerly codified at* § 39-71-407(7), MCA (2007), *and presently codified at* § 39-71-407(10), MCA (2011). Furthermore, the Legislature added the following italicized language to the definition of "injury" in § 39-71-119(1), MCA: "(a) internal or external physical harm to the body *that is established by objective medical findings*; . . . ." Laws of Montana, 1995, ch. 243, § 6 (italics in original).

¶48    As discussed, we interpret §§ 39-71-407(2) and -119, MCA, together. *See* ¶ 38, *supra*; *Prillaman*, 264 Mont. at 137, 870 P.2d at 84. Again, to constitute an "injury," the internal or external physical harm to the claimant's body must have been "caused by" a work-related accident. Section 39-71-119(1)(a), (2), MCA. In other words, a causal connection between the claimant's physical condition and a work-related accident is an integral part of establishing a compensable "injury" under § 39-71-407(2)(a), MCA. That "injury," and "the entitlement to benefits" generally, must be established by objective medical findings. Section 39-71-407(2)(a), (7), MCA. It follows, then, that not only the physical harm but also the causal connection must be established by objective medical findings. Indeed, that was the plain intent of the Legislature's 1995 amendments to these statutes subsequent to our decisions in *Plainbull* and *Prillaman*.

¶49    For these reasons, we overrule the statement in *Boyd*, ¶ 22, that "claimants are not required to prove causation through medical expertise or opinion." Claimants are required to establish injury and causation by objective medical findings. Accordingly,

26

contrary to Ford's argument, the WCC did not err by relying solely on medical opinions to determine causation or aggravation in this case.

## C. Evaluation of the Evidence

¶50 Lastly, Ford claims the WCC erred in concluding that he did not prove a causal connection between his industrial accident and his cervical disc condition. Sentry, on the other hand, argues that the medical evidence establishes, more probably than not, that Ford sustained a cervical strain injury in the accident and that the accident did not cause or aggravate his underlying cervical condition. We agree with Sentry.

¶51 There is no dispute that Ford has a cervical spine condition for which surgical treatment has been recommended. There also is no dispute that certain MRI findings, such as the bony ridging, could not have developed in the 21 days between the accident and the MRI and, therefore, must have been present before the accident. And there is no dispute that Ford suffered some sort of physical harm from the repeated "snapping back" motions when he tried to dislodge the jammed metal from the baler. What is in dispute is the particular harm Ford suffered—a cervical strain, or damage to his cervical discs for which surgery is required. In other words, is it more probable than not that Ford's spinal condition for which he seeks surgery was caused by the accident?

¶52 Dr. Ross is an occupational medicine specialist who was Ford's primary treating physician for six months. Dr. Schubert was Ford's treating neurosurgeon for two months. Dr. Gary, also a neurosurgeon, saw Ford for an independent medical examination. All three doctors agreed that Ford suffered a cervical strain from essentially a "whiplash" mechanism of injury. All three doctors agreed that the degenerative changes shown on

27

Ford's MRI were present before the accident. Drs. Schubert and Gary opined that some disc herniation *could* have occurred with the accident, but that this was only a medical "possibility" and not a medical "probability." All three doctors agreed that Ford's subjective complaints did not correlate well or fit with his cervical pathology shown on the MRI. All three doctors agreed that the recommended surgery was necessary to address Ford's preexisting and radiographically confirmed degenerative spine condition, and not to address the symptoms that he was complaining of. None of the three doctors was optimistic that surgery would significantly improve Ford's pain complaints. Dr. Schubert stated that any improvement in Ford's headaches would be a "bonus" of the surgical procedure, rather than an expected result, and that surgery for axial neck pain in the face of degenerative changes had at best a 50/50 chance of improvement in symptoms without confounding factors. Drs. Ross and Gary expressed their opinions on a "more probable than not" basis. Dr. Schubert expressed his opinions in terms of medical "probabilities."

¶53    Dr. Moseley is the only doctor to have offered an opinion that Ford suffered something more than a cervical strain injury. Dr. Moseley, also a neurosurgeon, saw Ford for an independent medical examination. He opined, "within a reasonable degree of medical probability," that the accident had caused the discs at the C5-6 and C6-7 levels to bulge significantly enough to compress and impinge Ford's spinal cord. The bases of this opinion were: Ford was asymptomatic prior to the accident; in Dr. Moseley's experience, patients with the sort of cervical pathology shown on Ford's MRI seek medical treatment urgently; Ford immediately sought medical treatment one day after his injury; Ford's

28

symptoms have continued; and rapid hyperextension and flexion of the cervical spine is one of the most common methods of aggravating discs in the cervical spine.

¶54    Ford contends that Dr. Moseley's opinion is the only medical opinion that fits all the facts of this case and that the WCC erred in crediting Dr. Schubert's and Dr. Gary's opinions over Dr. Moseley's. He presents essentially three arguments in this regard.

¶55    First, Ford argues that a cervical strain diagnosis cannot be correct because he underwent treatments for cervical strain and his symptoms persisted nonetheless. Ford testified that he faithfully complied with his physical therapy but that it did not provide lasting relief, and he notes that the WCC found him to be a credible witness. Ford fails to acknowledge, however, other explanations for his ongoing symptoms. It was precisely because he continued to complain of pain—despite the absence of any objective findings in the MRI results or on the physical examinations to explain his complaints—that Drs. Ross and Schubert concurred in sending Ford for a psychological evaluation. Dr. McElhinny determined that Ford has a somatoform pain disorder which is being fueled by depression; that Ford is more likely to exhibit physical symptomatology, like high levels of pain, in lieu of emotional distress; that Ford is prone to "manipulative behaviors" when seeking medical care and treatment; and that medical care providers, therefore, should use only "objective medical evidence" when prescribing treatments for Ford. Ford's pain complaints must be viewed in light of Dr. McElhinny's unrefuted assessment. In addition, Dr. Gary opined that Ford's migrainous headaches could be related to his chronic use of narcotic medication, as opposed to his cervical disc condition. Hence, given the medical evidence, the fact that Ford reported he did not

experience relief from the cervical strain treatments does not make the cervical strain diagnosis—in which three of his physicians concurred—less probable.

¶56 Second, although Drs. Schubert and Gary stated that some disc herniation in the accident was a medical "possibility," but not a medical "probability," Ford nevertheless contends that we can infer he suffered damage to his cervical discs given the onset of his symptoms and the mechanism of his injury. Specifically, Ford states that he lacked neck symptoms before the accident; that repetitive hyperextension and flexion of the cervical spine is known to aggravate degenerative cervical spine conditions; that he had an immediate onset of symptoms following the accident; and that if his cervical disc condition was as bad before the accident as it appeared on the MRI taken after the accident, then he surely would have had symptoms and sought medical attention prior to the accident. Dr. Moseley engaged in the very same reasoning.

¶57 The fact that Ford had an immediate onset of symptoms following the accident, however, does not necessarily establish that the accident more probably than not caused or aggravated his cervical disc condition. Rather, the crux of Dr. Moseley's opinion, and of Ford's argument, is that Ford would have been in pain prior to the accident if his cervical condition, as shown on his post-injury MRI, did in fact exist prior to the accident. Yet, as Drs. Ross, Schubert, and Gary attested, Ford's subjective complaints do not correlate or fit with what is shown on the MRI. Dr. Moseley is alone in suggesting the contrary, and the persuasive value of his opinion is low. For one thing, unlike the reports of Drs. Ross, Schubert, and Gary, there is no indication in Dr. Moseley's report that he specifically took Dr. McElhinny's findings into account. Moreover, in reviewing

Dr. Moseley's diagnosis of cervical radiculopathy, Dr. Gary pointed out that Ford had not described "a true radiculopathy" and that there were no objective findings of radiculopathy in Ford's medical records. Lastly, Dr. Moseley did not document or cite any objective findings specific to his examination of Ford, but instead relied on generalizations about his past experiences with other patients.

¶58 Third, Ford contends that Dr. Schubert's opinion should be rejected because Dr. Schubert allegedly changed his diagnosis and treatment recommendation "simply to run with the herd and avoid a deposition or trial testimony." There is absolutely no evidence in the record, however, substantiating the theory that Dr. Schubert tailored his medical opinions for such purposes. Moreover, contrary to Ford's argument, Dr. Schubert never said that Ford's neck pain and headaches were more probably than not attributable to the disc problems shown on his MRI or that Ford had more probably than not suffered an aggravation of his cervical disc condition. What Dr. Schubert said in his early reports was that a disc herniation "may have occurred" at the time of the accident, that Ford's underlying asymptomatic degenerative condition "could have become" symptomatic as a result of the accident, and that Ford's cervical condition "may" be the cause of his neck pain. It is clear that Dr. Schubert was reluctant to give a definitive opinion on causation at this stage. On the other hand, it is noteworthy that Dr. Schubert consistently viewed surgery as necessary primarily to address Ford's preexisting degenerative spine condition, and only incidentally to address Ford's pain. Dr. Schubert's position has always been that the surgical procedure to address Ford's

31

cervical spine condition has at best a 50/50 chance of also providing significant improvement in Ford's neck pain, with no likely change in his hand symptoms

¶59 Although they are not conclusive, the opinions of Ford's treating physicians (Drs. Ross and Schubert) are entitled to greater weight than the opinions of the other expert witnesses. *EBI/Orion Group*, ¶¶ 12-13. We agree with the WCC that no grounds exist in the record for weighing Dr. Moseley's opinion more heavily than the opinions of Ford's treating physicians. Based on all of the medical opinions in this case, we conclude it is more probable than not that Ford suffered a cervical strain injury on September 29, 2009, and that the recommended surgery is necessary to address his preexisting degenerative spine condition rather than an injury or condition resulting from the accident. The WCC's determination that Ford failed in his burden to establish causation is accordingly affirmed.

¶60 ***Issue 2. Whether the WCC erred in determining that Sentry is not liable for ongoing temporary total disability benefits.***

¶61 A worker is eligible for temporary total disability benefits (a) when the worker suffers a total loss of wages as a result of an injury and until the worker reaches maximum healing, or (b) until the worker has been released to return to the employment in which the worker was engaged at the time of the injury or to employment with similar physical requirements. Section 39-71-701(1), MCA. The determination of temporary total disability must be supported by a preponderance of objective medical findings. Section 39-71-701(2), MCA.

¶62 Ford contends the WCC erred in concluding that he is not entitled to ongoing temporary total disability benefits. He maintains that he "is incapable of working due to his cervical disk condition resulting from his industrial accident." As discussed above, however, Ford has failed to establish, on a more probable than not basis, that his cervical disc condition was caused by the accident. The objective medical findings establish, rather, that it is more probable than not he suffered a cervical strain injury as a result of the accident. It is that injury we must assess here.

¶63 Following his September 30, 2009 evaluation of Ford (the day after the accident), Mattingly released Ford to work with temporary restrictions—specifically, Ford was not to lift heavy objects and was to minimize continuous twisting or bending of his neck. Ford was released to work with similar temporary restrictions following his subsequent visits with Dr. Ross. On May 17, 2010, Dr. Ross concluded that Ford could be released "to regular and unrestricted work duties." Dr. Ross noted that there were "no permanent limitations or restrictions" attributable to the accident. He gave Ford a "0% whole person impairment" rating per the AMA Guides to the Evaluation of Permanent Impairment, 6th edition. Dr. Gary, in his July 23, 2010 report, stated that he agreed with this rating.

¶64 While Ford disagrees with Dr. Ross's assessment, the fact remains that no doctor has disputed Dr. Ross's opinion that Ford can return to work without restriction. The WCC cited this fact in concluding that Ford is not entitled to temporary total disability benefits. As noted, the determination of temporary total disability must be supported by a preponderance of objective medical findings. Section 39-71-701(2), MCA. Ford has failed to do so, and the WCC's decision as to this issue is accordingly affirmed.

¶65   *Issue 3. Whether the WCC erred in determining that Sentry is not liable for costs, attorney's fees, or a penalty.*

¶66   Because Ford's claim has not been "adjudged compensable," he is not entitled to costs and attorney's fees under § 39-71-611, MCA.  Nor is he entitled to the 20 percent penalty under § 39-71-2907, MCA.

## CONCLUSION

¶67   In summary, a workers' compensation claimant's burden to establish an accident, an injury or aggravation of a preexisting condition, and a causal connection between the accident and the injury/aggravation is "more probable than not."  In meeting this burden, the claimant must establish injury and causation by objective medical findings.  Ford failed to meet this burden with respect to his cervical disc condition.  He also has not established by a preponderance of objective medical findings that he is entitled to ongoing temporary total disability benefits subsequent to May 17, 2010.

¶68   In closing, we note that Ford has expressed concern in his reply brief regarding Sentry's argument that causation must be established "by objective medical findings."  As discussed above at ¶¶ 44-49, we agree with Sentry that §§ 39-71-407 and -119, MCA, impose this requirement.  Ford fears that such an interpretation will have "huge negative implications for Montana workers' compensation claimants" because in many cases no objective medical findings have been developed to establish the baseline state of a preexisting condition owing to the fact that the preexisting condition was asymptomatic.  Ford posits, therefore, that it may be difficult or impossible to establish aggravation of a preexisting condition by objective medical findings.  Whether or not this is true, however,

34

it does not control our resolution of this case. Absent a direct constitutional challenge to the statutes, this Court's role is simply to interpret and apply the statutes as written and consistent with legislative intent. Sections 1-2-101, -102, MCA. We must leave it to the Legislature to consider Ford's concerns regarding the ability of claimants to establish causation through objective medical findings as the statutes, at present, clearly require.

¶69 The July 20, 2011 judgment of the Workers' Compensation Court is affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JIM RICE

Justice Michael E Wheat, concurring.

¶70 I concur in the Court's Opinion, although I do so reluctantly, and with two caveats.

¶71 First, I fear that the "no fault" half of the quid pro quo is on a relentless course toward disappearing altogether. In my view, this is a very close case, and, had I been the trial judge, I might very well have reached a different result. In the end, however, the

evidence in the record supports the WCC's findings, and under our standard of review I am compelled to defer to those findings.

¶72 Second, I cannot agree with Sentry's argument that "reasonable degree of medical certainty" and "more probable than not" are synonymous and interchangeable. In my view, the former is a qualitatively higher burden of proof than the latter. I believe that "reasonable degree of medical certainty" is to "more probable than not" as "beyond a reasonable doubt" is to "preponderance of the evidence." That being said, the Court concludes that in resolving this case, it is not necessary to address the difference between the "more probable than not" and "reasonable degree of medical certainty" standards. Opinion, ¶ 41. On the record here, I agree with the Court. I am confident that the WCC, in future cases, will consistently apply the statutory standard prescribed by § 39-71-407, MCA, regardless of the particular terminology used by physicians.

¶73 I concur.

/S/ MICHAEL E WHEAT

Chief Justice Mike McGrath joins the Concurrence of Justice Michael E Wheat.

/S/ MIKE McGRATH